839 A.2d 850

MILDRED SMITH, PLAINTIFF–RESPONDENT, v. SBC COMMUNI-CATIONS INC., DEFENDANT, AND SOUTHERN NEW ENG-LAND TELEPHONE CO., D/B/A SNET, DEFENDANT–RESPON-DENT, AND BJ'S WHOLESALE CLUB, INC., DEFENDANT–APPELLANT.

Argued October 7, 2003—Decided January 21, 2004.

266

*Jonathan J. Bart,* a member of the Pennsylvania bar, argued the cause for appellant (*Silverman Bernheim & Vogel,* attorneys).

*Donald P. Alexander,* a member of the Pennsylvania bar, argued the cause for respondent Mildred Smith (*Shepherd, Fink-*

*elman, Miller & Shah* and *Sherman, Silverstein, Kohl, Rose & Podolsky,* attorneys; *James C. Shah,* on letter brief).

*Gavin J. Rooney* submitted a letter in lieu of brief on behalf of respondent Southern New England Telephone Co., d/b/a SNET (*Lowenstein Sandler,* attorneys).

Justice ZAZZALI delivered the opinion of the Court.

In *Weinberg v. Sprint Corp.,* 173 *N.J.* 233, 801 *A.*2d 281 (2002), we concluded that the filed rate doctrine effectively barred plaintiffs from seeking monetary and injunctive relief against telecommunications carriers under the Consumer Fraud Act, *N.J.S.A.* 56:8-1 to 20, because the doctrine precluded plaintiffs from pleading a claim of ascertainable loss capable of surviving a motion for summary judgment. In this appeal, we are asked to consider whether that same doctrine insulates a retailer of telecommunications services, which is not itself a telecommunications carrier, from an action alleging breach of contract and consumer fraud arising out of the sale of prepaid calling cards. Because we conclude that the doctrine does not apply to retailers in every circumstance involving the sale of telecommunications services, we affirm the judgment of the Appellate Division and remand for further proceedings.

I.

Plaintiff Mildred Smith filed this Consumer Fraud Act and breach-of-contract suit on behalf of a putative class seeking compensatory damages and injunctive relief on the grounds that Southern New England Telephone Company (SNET) and BJ's Wholesale Club, Inc. (BJ's) falsely advertised that prepaid calling cards purchased at BJ's would yield substantially more calling time than plaintiff actually received.[1] Because this appeal comes to us on a *Rule* 4:6-2(e) motion to dismiss, we accept as true all

---

[1] SBC Communications, Inc., originally named as a defendant in the complaint, was dismissed by joint stipulation of the parties.

factual assertions in the complaint. *Craig v. Suburban Cablevision, Inc.*, 140 *N.J.* 623, 625, 660 *A.*2d 505, 506 (1995). Our recitation of the facts, therefore, derives from the complaint. In addition, we consider the content of SNET's tariff filed with the Federal Communications Commission (FCC) that was submitted to the Law Division with SNET's motion to dismiss.

SNET is a telecommunications corporation that provides, among other services, calling cards and prepaid phone-card services to the eastern and northeastern United States. Its rates are governed by the FCC and the Federal Communications Act of 1934, 47 *U.S.C.A.* §§ 151–615b (FCA). At the time the complaint was filed, BJ's operated approximately ninety-six wholesale clubs throughout the United States, offering discounted merchandise to its club members. It does not appear to be a telecommunications carrier subject to FCC regulation. During the relevant timeframe, vending machines in BJ's clubs dispensed SNET prepaid phone cards under the brand name "BJ's Wholesale Club Pre–Paid Phone Card."

The complaint alleges that SNET and BJ's "jointly controlled" point-of-sale advertising and marketing materials relied on by plaintiff. Those marketing materials informed consumers that the prepaid phone cards sold in the vending machines provided a 9.9–cents–per–minute rate for calls placed with the card. As advertised, consumers could purchase a $10 card purporting to yield 101 minutes of calling time or a $20 card ostensibly yielding 202 minutes of calling time. However, the cards provided "significantly fewer" minutes than advertised. The discrepancy between the advertised rates and the actual charges results from certain surcharges, none of which, according to the complaint, are mentioned in the point-of-sale information. Those surcharges include a 30 cents surcharge for each call originating from a payphone, a 30 cents surcharge for each call originating from a phone as to which long-distance calling has been "blocked," a 30 cents surcharge for each call originating from a hotel or motel room, and a charge for every call that does not connect to the intended

recipient. Additionally, all calls are "rounded-up" to the next minute.

Plaintiff purchased a $20 card from a vending machine inside of a BJ's store. She expected to receive 202 minutes of calling time. After using her prepaid card, however, plaintiff discovered that she received only fifty minutes or less of calling time, amounting to an effective rate of nearly 40 cents per minute.

As noted, plaintiff filed a class-action suit premised on consumer fraud and breach of contract. Specifically, the claim of fraud alleges that SNET and BJ's falsely advertised the rate applicable to the prepaid calling cards in violation of various provisions of the Consumer Fraud Act. Her contract theory asserts that the point-of-sale description of the phone card's terms and conditions constituted a legally-binding offer that plaintiff accepted at the time of purchase.

SNET moved to dismiss the complaint pursuant to *Rule* 4:6–2(e), arguing that plaintiff's claim was barred by the filed rate doctrine (also referred to as the filed tariff doctrine), which provides that no carrier can charge a rate that differs from those on file with the FCC. *Weinberg, supra,* 173 *N.J.* at 242, 801 *A.*2d at 286. Annexed to SNET's motion were the applicable prepaid phone-card service rates that SNET had filed with the FCC. In those filings, although there were differences over time in the rates applicable to bulk purchases, SNET consistently indicated a usage charge of 40 cents per minute. BJ's joined in SNET's motion.

The Law Division dismissed both the consumer-fraud claim and the breach-of-contract claim against SNET on the basis of the filed rate doctrine. Explaining that the filed tariff was the only enforceable contract between plaintiff and SNET, the court concluded that the doctrine precluded plaintiff from demonstrating an ascertainable loss, which is a prerequisite for any private cause of action under the Consumer Fraud Act. For essentially the same reason, the court dismissed plaintiff's fraud claim against BJ's. The court dismissed the contract claim against BJ's on the ground

that the complaint did not allege a contract between plaintiff and BJ's.

On appeal, the Appellate Division affirmed the Law Division on the claims for monetary damages against SNET, but remanded for a determination of whether injunctive relief was warranted as to both SNET and BJ's. The panel also reversed the dismissal of the damages claim against BJ's as premature, noting that plaintiff's complaint, read liberally, alleged a separate contractual relationship between the consumer and BJ's.

SNET and BJ's petitioned for certification. Before deciding that petition, we decided *Weinberg v. Sprint Corp., supra,* which held that, to have standing under the Consumer Fraud Act, a party must raise a genuine issue of fact as to the existence of ascertainable loss. 173 *N.J.* at 237, 801 *A.*2d at 283. Because the filed rate doctrine prevented the plaintiff from demonstrating ascertainable loss in the form of damages against the defendant, a telecommunications carrier, we determined that equitable relief and attorneys' fees were also unavailable under the act. *Id.* at 254, 801 *A.*2d at 293. In view of that holding, we granted both petitions for certification, 174 *N.J.* 187–88, 803 *A.*2d 1160 (2002), and summarily remanded to the Appellate Division for reconsideration.

On reconsideration, the Appellate Division found that plaintiff's claims for injunctive relief and attorneys' fees against SNET could not proceed. Accordingly, plaintiff's claims against SNET were dismissed. Similarly, the panel concluded that *Weinberg* effectively vitiated its prior holding that plaintiff could obtain injunctive relief against BJ's if it were only an agent of SNET. Subject to those modifications, however, the Appellate Division reaffirmed its reinstatement of plaintiff's complaint against BJ's, explaining "plaintiff's contractual claims against BJ's stand on different footing, at least on the present record."

BJ's again petitioned for certification. We granted certification, 175 *N.J.* 432, 815 *A.*2d 478 (2003), and now affirm.

## II.

### A.

We recently had occasion to explore in some detail the development of the filed rate doctrine. *Weinberg, supra,* 173 *N.J.* at 240–44, 801 *A.*2d at 285–88. Although we need not repeat that entire discussion here, the following observations merit particular emphasis in the context of this appeal.

Interstate telecommunications carriers are subject to regulation by the FCC pursuant to the Federal Communications Act of 1934, *supra.* During the period of time relevant to the complaint, the FCA and FCC required telecommunications carriers to file a tariff with the FCC showing all charges for each telephone service they provided, as well as all "classifications, practices, and regulations affecting such charges." [2] 47 *U.S.C.A.* § 203(a). Under the FCA, "[c]arriers are prohibited from providing communications services except pursuant to a filed tariff, and may not charge, demand, collect, or receive a rate other than the rate listed in the applicable tariff." *Fax Telecommunicaciones Inc. v. AT & T,* 138 *F.*3d 479, 482 (2d Cir.1998) (citing 47 *U.S.C.A.* § 203(c)). In addition, "carriers are prohibited from unreasonably discriminating between customers in charges, practices, classifications, regulations, facilities, or services." *Ibid.* (citing 47 *U.S.C.A.* § 202(a)). To effectuate those mandates, the United States Supreme Court has held that "the century-old 'filed rate doctrine' . . . applies to the Communications Act. . . ." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,* 524 *U.S.* 214, 222, 118 *S.Ct.* 1956, 1962, 141 *L.Ed.*2d 222, 233 (1998) (*Central Office*).

 The filed rate doctrine "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Ark. La. Gas Co. v.*

---

[2] As noted in *Weinberg, supra,* 173 *N.J.* at 242 n. 2, 801 *A.*2d at 286, as of July 31, 2001, the FCC ended the practice of setting rates, terms, and conditions through tariffs.

*Hall,* 453 *U.S.* 571, 577, 101 *S.Ct.* 2925, 2930, 69 *L.Ed.*2d 856, 863–64 (1981). " 'Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and [customer]. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.' " *Fax Telecommunicaciones, supra,* 138 *F.*3d at 488 (alteration in original) (quoting *Keogh v. Chicago & Northwestern Ry. Co.,* 260 *U.S.* 156, 163, 43 *S.Ct.* 47, 49, 67 *L.Ed.* 183, 187 (1922)). "All customers are 'conclusively presumed' to have constructive knowledge of the filed tariff. . . ." *Id.* at 489 (quoting *Kansas City S. Ry. Co. v. Carl,* 227 *U.S.* 639, 653, 33 *S.Ct.* 391, 395, 57 *L.Ed.* 683, 688 (1913)). "[E]ven if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *Central Office, supra,* 524 *U.S.* at 222, 118 *S.Ct.* at 1963, 141 *L.Ed.*2d at 233.

In view of the foregoing, *Weinberg* observed that a strict application of the filed rate doctrine advances two policy goals: "(1) the prevention of price discrimination by carriers as among ratepayers; and (2) the preservation of the exclusive role of federal agencies in approving reasonable rates for telecommunications service and the exclusion of courts from the ratemaking process." 173 *N.J.* at 242, 801 *A.*2d at 286 (citing *Fax Telecommunicaciones, supra,* 138 *F.*3d at 489). Those "companion principles" are often referred to as the "nondiscrimination strand" and the "nonjusticiability strand." *Marcus v. AT & T Corp.,* 138 *F.*3d 46, 58 (2d Cir.1998).

In *Weinberg, supra,* a customer brought a class-action lawsuit against defendant Sprint Corporation on behalf of residential users of the defendant's long-distance telephone services. He alleged that the defendant's advertising practices were designed to misrepresent and conceal its practice of "rounding up" to the next minute its charges for long-distance telephone calls. 173 *N.J.* at 237–38, 801 *A.*2d at 283–84. The defendant's federally filed tariffs for its long-distance service reflected "per-minute" rates. *Id.* at

238, 801 *A*.2d at 284. In view of the non-discrimination and non-justiciability principles, we concluded that "the filed rate doctrine bars money damages from telecommunication carriers where the damage claims are premised on state contract principles, consumer fraud, or other bases on which plaintiffs seek to enforce a rate other than the filed rate." *Id.* at 243, 801 *A*.2d at 287. Accordingly, we held that the plaintiff had "no claim for monetary damages because he was charged the per-minute rate disclosed in the tariff." *Id.* at 247, 801 *A*.2d at 289. Any other result would have deviated from the tariff and, therefore, would have been "discriminatory under the doctrine." *Ibid.*

Having determined that the plaintiff was prohibited from seeking monetary relief because of the operation of the filed rate doctrine, we concluded such a plaintiff could not demonstrate an ascertainable loss as required under the Consumer Fraud Act. The ultimate issue in that case then became "whether a private plaintiff, who is unable to ... demonstrat[e] ... ascertainable loss, may nonetheless proceed with a claim for injunctive relief under the Consumer Fraud Act." *Ibid.* After examining the language, structure, and legislative history of the act, we concluded that, irrespective of whether the plaintiff sought legal or equitable relief, the Consumer Fraud Act created a private cause of action "only for victims of consumer fraud who have suffered an ascertainable loss." *Id.* at 249, 801 A.2d at 290 (citing *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 *N.J.* 464, 473, 541 *A*.2d 1063 (1988)). Because the filed rate doctrine precluded the plaintiff from demonstrating that loss, we held that the plaintiff's claims for injunctive relief and attorneys' fees under the Consumer Fraud Act were properly dismissed. *Id.* at 254, 801 *A*.2d at 293.

### B.

As indicated, the filed rate doctrine is a court-created rule barring suits against regulated carriers that challenge the reasonableness of the carrier's filed rates or that would have the practical effect of causing the carrier to charge a segment of its

consumers a rate that varies from the filed tariff. *Central Office, supra,* 524 *U.S.* at 222–23, 118 *S.Ct.* at 1963, 141 *L.Ed.*2d at 233–34. A separate question is presented, however, when an aggrieved consumer seeks to sue a party other than a carrier for fraud or deceit with respect to the resale of those services. In that circumstance, which is the central question in this appeal, the applicability of the filed rate doctrine has not been settled.

*Central Office, supra,* is the most recent United States Supreme Court decision exploring the applicability of the filed rate doctrine in the telecommunications context. Although that opinion deals with a suit by a reseller of telecommunications services against the carrier of those services, and therefore is not directly applicable to the circumstances of this appeal, two points are worthy of mention. First, that opinion emphasizes that the filed rate doctrine's application is necessary only when one of the doctrine's core purposes is implicated. *Id.* at 223, 118 *S.Ct.* at 1963, 141 *L.Ed.*2d at 233 (explaining that filed rate doctrine exists to protect "[the] antidiscriminatory policy which lies at 'the heart of the common-carrier section of the Communications Act' ") (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,* 512 *U.S.* 218, 229, 114 *S.Ct.* 2223, 2231, 129 *L.Ed.*2d 182, 192 (1994)). As Chief Justice Rehnquist explained in his concurring opinion:

> Central to [the] antidiscriminatory policy is the notion that all purchasers of services covered by the tariff will pay the same rate. The filed rate doctrine furthers this policy by disallowing suits brought to enforce agreements to provide services on terms different from those listed in the tariff. This ensures that the tariff governs the terms by which the common carrier provides those services to its customers.
>
> It is crucial to note, however, that this is all the tariff governs. *In order for the filed rate doctrine to serve its purpose, therefore, it need pre-empt only those suits that seek to alter the terms and conditions provided for in the tariff.*
>
> [*Id.* at 229, 118 *S.Ct.* at 1966, 141 *L.Ed.*2d at 237 (emphasis added).]

Second, *Central Office* recognizes that the purchase and resale of telecommunication services for profit is a common practice in the telecommunications industry. *Id.* at 216, 118 *S.Ct.* at 1959, 141 *L.Ed.*2d at 229. The Court noted that the reseller in *Central Office,* "[l]ike many other resellers in the telecommunications

industry," purchased long-distance services in bulk quantities, "pass[ing] along only a portion of the bulk-purchase discount to its aggregated customers, and retain[ing] the remaining discount as profit". *Ibid.* Thus, although its holding barred the reseller from asserting a claim against a common carrier because that claim would have caused the carrier to deviate from its filed tariff, the opinion acknowledges that, consistent with the FCA, business entities often buy telecommunications services governed by a tariff and resell those services with price terms that deviate from the tariff.

With respect to the filed rate doctrine's applicability to suits against non-carriers, our examination of the existing case law has yielded only one opinion relevant to our analysis, *Day v. AT & T Corp.*, 63 *Cal.App.*4th 325, 74 *Cal.Rptr.*2d 55 (1998). In *Day*, the plaintiffs, acting as private attorneys general under various consumer-protection statutes, sought injunctive relief against two common carriers and four non-carrier, phone-card retailers because of their false-advertising practices. The plaintiffs alleged that the defendants acted fraudulently by failing to disclose in their advertising and packaging materials that calls made with the prepaid calling cards would be rounded up to the next full minute. *Id.* at 57. Reversing the trial court and reinstating the complaint, the court explained that the plaintiffs' claims for injunctive relief did not implicate the filed rate doctrine because an injunction requiring defendants to disclose their billing practices would not require defendants to deviate from the filed rate and did not otherwise implicate the reasonableness of the rates as determined by the FCC. *Id.* at 62–63.

Turning to the scope of the relief available, however, the court determined that the plaintiffs were precluded from seeking disgorgement of defendants' profits, explaining that the "net effect of imposing any monetary sanction on the [defendants] will be to effectuate a rebate, thereby resulting in discriminatory rates." *Id.* at 63. That was so, the court reasoned, because "once the cards were purchased and used, the members of the public

received *exactly what they paid for*," after plaintiffs' imputed knowledge of the filed tariff was taken into account. *Id.* at 64. Because the plaintiffs received the filed rate and were not challenging the propriety of that rate, there were no ill-gotten profits to restore. *Ibid.* The *Day* court, however, observed that it "need not reach" the applicability of the filed rate doctrine to non-common carriers. *Id.* at 65. Thus, it left unaddressed the disgorgement of profits from the defendant retailers.

Ultimately, the question whether the filed rate doctrine bars claims against a particular entity turns on the applicability of the doctrine's "companion principles," *i.e.*, non-justiciability and non-discrimination. *Marcus, supra,* 138 *F.*3d at 58. In the context of claims against non-carriers such as retailers, those principles require us to examine the nature of the relationship between the carriers and the non-carriers and the extent to which an adverse ruling against the non-carriers would impinge on the filed rates.

■ For example, when an agency relationship exists between the carrier and non-carrier, a suit involving the services sold by the agent continues to implicate the dual purposes of the filed rate doctrine. Unless the filed rate doctrine is "rigidly enforced" when a non-carrier is an agent for a carrier, a carrier could devise a scheme allowing it to circumvent the tariff rates through the use of an agent. *Fax Telecommunicaciones, supra,* 138 *F.*3d at 489. More specifically, as the Second Circuit has noted, carriers, through their agents, "might intentionally 'misquote' rates to certain customers, contrary to the principles motivating the FCA." *Ibid.* As the Supreme Court has observed, "agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored [customers], while other [customers] ... whose [business] is less important, would be compelled to pay the higher published rates." *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 *U.S.* 116, 128, 110 *S.Ct.* 2759, 2766, 111 *L.Ed.*2d 94, 109 (1990) (internal quotation marks and citations omitted). In those circumstances, the agent, even if otherwise culpable under state law for fraud or breach of contract,

cannot be held liable for damages because the net effect of imposing any monetary sanction on the agent would be to effectuate a rebate for the services provided by the carrier, thereby resulting in discrimination between ratepayers.

That scenario can be readily distinguished from the situation in which a retailer, acting with complete independence from the telecommunications carrier, buys from a reseller or issuer telecommunications services that were purchased previously from a carrier in accordance with the terms and conditions of a filed tariff. In that circumstance, a suit brought by the end-user against the retailer alleging fraud or breach of contract arising out of the resale of those services implicates neither of the filed rate doctrine's cardinal principles.

With respect to the non-justiciability strand, the contract between the retailer and the end-user exists outside of the FCC's jurisdiction. Because the retailer is not a telecommunications carrier, it does not file a tariff establishing the terms and conditions governing its resale of the pre-purchased telecommunications services. Once the FCC approves the initial tariff, and the sale from the carrier to the reseller complies with those terms, the issuance of calling cards and the resale of those telecommunication services through cards that may have different pricing terms or conditions does not implicate the reasonableness of the original tariff's terms. In that circumstance, although the end-user would have "no greater rights than the reseller to assert claims against a *carrier* based on a failure to provide services which conflict with the carrier's filed tariff," *Duggal v. G.E. Capital Communications Servs., Inc.*, 81 *Cal.App.*4th 81, 96 *Cal.Rptr.*2d 383, 392 (2000) (emphasis added), the arrangement would not preclude the end-user from claiming that the *retailer* falsely advertised the services provided or otherwise breached a contract between the retailer and the end-user. A suit of that nature "would neither enmesh the court in the rate-making process nor undermine the regulatory authority of the FCC." *Marcus, supra,* 138 *F.*3d at 62.

Nor does an action by an end-user in such circumstances implicate the non-discrimination strand. After the FCC-approved tariff is filed, the carrier and reseller may enter into a contract for the sale of services in accordance with the tariff's terms. Once that initial sale is completed and the tariff's terms obeyed, the filed rate doctrine does not prevent a retailer from purchasing and reselling those services at rates that are higher or lower than the original purchase price. As noted, the reseller in *Central Office* engaged in exactly that type of behavior—buying telecommunications services at a bulk rate and then reselling those services at prices between the bulk rate and regular rate in order to make a profit. 524 *U.S.* at 216, 118 *S.Ct.* at 1959, 141 *L.Ed.*2d at 229.

The independent resale of the services to a third party has no discriminatory effect on the availability of the rates offered to the public by the carrier. A member of the public wishing to purchase the services under the same terms and with the same rates as those sold to a reseller is free to buy those services in accordance with the terms offered under the filed tariff. Similarly, damages resulting from a lawsuit involving the resale will not provide the victors with any type of discount as compared to other purchasers of tariffed services because their claims arise out of a sales arrangement that exists completely independent of the original purchase agreement implicating the filed rate. To hold otherwise would lead to the nonsensical conclusion that a consumer who purchases a calling card and then gives that card to a friend or relative free of charge, or sells it to a stranger at a price different from the filed rate, violates the FCA by discriminating impermissibly among ratepayers in the provision of services.

## C.

The fundamental difference between a telecommunications carrier providing communications services and a retailer offering cards that allow end-users to access those services underscores the inapplicability of the non-justiciability and non-discrimination strands to the present appeal. The FCC has commented on that

difference in *AT & T Corp. v. BellSouth Corp.*, 14 *F.C.C.R.* 8515, 1999 *WL* 172908 (March 30, 1999). In *BellSouth*, AT & T filed a complaint with the FCC alleging that the BellSouth Corporation and its carrier subsidiaries (collectively BellSouth) violated a provision of the Federal Communications Act barring regional carriers from offering long-distance services in their local markets until they could demonstrate that they had opened up those local markets to competition. *Id.* at 8515–16, ¶ 1. Specifically, AT & T argued that BellSouth violated the FCA by marketing and selling the "BellSouth Prepaid Phone Card" in its local region. *Ibid.* BellSouth claimed its actions did not violate the FCA because, under the terms of the card offering, it was not providing the phone-card services at issue. All of the long-distance services offered to card purchasers were provided by U.S. South, a resale-based telecommunications carrier with which BellSouth had entered into a sales agreement. *Id.* at 8516, ¶ 1, 8520, ¶ 8.

Dismissing the complaint, the FCC concluded that, under existing precedent, BellSouth did not hold itself out as a provider of in-region, long-distance services by issuing the prepaid card. *Id.* at 8531–32, ¶ 33. As additional support for that conclusion, the FCC explained:

> [M]any of the issuers of ... prepaid [calling] cards are companies that clearly are not telecommunications providers. For example, Exxon and WalMart both lend their names to cards similar to the one here, as does Top Flite, a manufacturer of golf equipment. These companies, which have no prior role in offering long-distance telecommunications, can not be said to be holding themselves out as providing such service through their prepaid calling cards. Rather, it appears that the issuers of such prepaid cards likely view the cards merely as a revenue source and an additional vehicle for building brand recognition. BellSouth and the other card issuers lend their names to a prepaid calling card. Without more, however, this does not mean that BellSouth is holding itself out as providing long-distance service.... Regardless of the corporate logo appearing on a particular card, it entitles the holder to a fixed amount of telecommunications service from the carrier that supports the card. We do not believe, however, that a prepaid calling card necessarily amounts to a presumption that Exxon or Top Flite, or in this case a BellSouth affiliate, is actually transmitting the calls placed using the card.
>
> [<em>Ibid.</em> (footnotes omitted).]

*See also In re MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 15 *F.C.C.R.* 23184, 23189, ¶ 10 n. 33 (Oct. 19, 2000) (characterizing

*BellSouth* decision as concluding that "the [BellSouth] card served a segment of the telecommunications market that is replete with similar prepaid offerings sponsored by *non-carriers*") (emphasis added).

Accordingly, as the FCC recognized in *BellSouth,* circumstances may exist in which retailers can sponsor or sell prepaid card services without being telecommunications carriers. If in so doing those parties fraudulently misrepresent the benefits of the services they are selling, they should be held accountable for that conduct. In contrast to a claim against the carrier, wherein any remedy requiring a refund of a portion of the filed rate is barred by application of the filed rate doctrine, a damage award resulting from the relationship between the end-user and a retailer would have no impact on the filed rate because the issuance, sponsorship, and retail of prepaid card services occurs completely independent of the initial purchase of those services by the retailer from a carrier. *See generally* Federal Communications Commission, *Pre–Paid Phone Cards: What Consumers Should Know, at* http://www.fcc.gov/cgb/consumerfacts/prepaidcards.html (last reviewed/updated Aug. 5, 2002) (generally describing differences between carriers, resellers, issuers, distributors, and retailers and noting retailers "may not have control over the quality of the card or the service it provides"). In such circumstances, a court would not be required to determine the reasonableness of the terms of the tariff because those terms would have no bearing on the allegedly wrongful or fraudulent acts of the retailer. Thus, the chief evils that the doctrine was designed to proscribe—rate discrimination and court interference in the ratemaking process—would not be implicated.

A contrary conclusion would leave certain segments of the community without any means of redressing the wrongful conduct of retailers. Because the retail of previously-purchased telecommunications services has no bearing on either the filed tariff or the reasonableness of its terms, the FCC would have no jurisdiction over a complaint arising out of an alleged breach of that sales

contract or false advertising with respect to the services that the retailer purported to offer. Yet, by wrapping themselves in the mantle of the filed rate doctrine, retailers of telecommunications services that purposefully deceive the public through their advertising would enjoy effective immunity. That result is unacceptable. Although the filed rate doctrine at times has been known to work "seemingly harsh and unfair results," *Fax Telecommunicaciones v. AT & T*, 952 *F.Supp.* 946, 951 (E.D.N.Y.1996), *aff'd*, 138 *F.*3d 479 (2d Cir.1998), its invocation is not so talismanic as to leave an aggrieved party in these circumstances without any means of redress.

██ In view of the foregoing, we conclude that the filed rate doctrine does not act as a *per se* bar to state-law causes of action against retailers that arise out of the marketing and sale of prepaid calling card services.

### III.

██ There is sufficient evidence in the complaint before us to suggest that the sale of the prepaid phone cards by BJ's, in the narrow circumstances presented, does not trigger the filed rate doctrine.

 Preliminarily, we note that on a motion to dismiss for failure to state a claim, the complaint must be searched "in depth and with liberality to ascertain whether the fundament of a cause of action can be gleaned even from an obscure statement of claim...." *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 746, 563 *A.2d* 31, 34 (1989) (quoting *Di Cristofaro v. Laurel Grove Mem'l Park*, 43 *N.J.Super.* 244, 252, 128 *A.2d* 281, 285 (App.Div.1957)). We accord every reasonable inference to the plaintiff. *Ibid.* The motion to dismiss should be granted only in rare instances and ordinarily without prejudice. As such, "[i]f a generous reading of the allegations merely suggests a cause of action, the complaint will withstand the motion." *F.G. v. MacDonell*, 150 *N.J.* 550, 556, 696 *A.2d* 697, 700 (1997).

Applying the foregoing standards to the complaint before us, we agree with the Appellate Division that, on the present record, "plaintiff's contractual claims against BJ's stand on different footing" than those she asserted against the carrier, SNET. When read liberally, the complaint alleges that BJ's had a measure of control over the advertising of the prepaid calling cards and entered into a separate contractual relationship with plaintiff in accordance with the terms and conditions offered in its promotional literature. Because of the sparseness of the record, we cannot conclude as a matter of law that the filed rate doctrine would bar a damage award in those circumstances or prevent plaintiff from proving an ascertainable loss under the Consumer Fraud Act.

The complaint alleges that SNET and BJ's had joint control over the point-of-sale marketing material. From this, BJ's attempts to infer an agency relationship between BJ's and SNET, which, as we previously noted, would warrant an application of the filed rate doctrine. However, discovery may reveal that BJ's acted with sufficient autonomy in the eventual marketing and sale of its prepaid calling cards to incur liability for fraudulent representations made to induce those sales in violation of the Consumer Fraud Act. In addition, by averring the basic elements of a contract—offer, acceptance, and consideration—the complaint suggests the existence of a separate agreement between BJ's and plaintiff that is completely independent of any arrangement between SNET and BJ's for the initial procurement of the prepaid calling cards. If those elements are proven, plaintiff's independent agreement with BJ's alone may be sufficient to support proceeding with a claim for breach of contract and consumer fraud.

BJ's suggests that imposing liability in this case would effectively transform any and all phone-card retailers, of whatever size or sophistication, into the guarantors of phone-company promotional literature. We disagree. According to the complaint, this is not the simple case of a gas station or local pharmacy setting up a display stand with prepaid phone cards and promotional literature provided by a card issuer. The complaint avers that, rather than

acting as a mere middleman, BJ's actively participated in the creation of the point-of-sale marketing materials and represented to its club members that it was making available prepaid cards with a 9.9–cents–per–minute rate. Even the cards themselves each proclaimed to be a "BJ's Wholesale Club Pre–Paid Phone Card." Those allegations, if proven true, suggest BJ's did far more than simply redistribute preprinted phone-company promotional literature.

Having determined that the filed rate doctrine is not an absolute bar to plaintiff's consumer-fraud and breach-of-contract claims, we decline defendant's invitation to reject plaintiff's alleged damages on the basis of her "presumed knowledge" of SNET's filed tariff. We note only, based on the limited record before us, that the tariff may have little, if any, bearing on the alleged contract between BJ's and plaintiff and the damages suffered thereunder. There is no indication in the complaint that the point-of-sale information disclosed to plaintiff that SNET was the carrier providing the phone-card service. "The central purpose of the filed rate doctrine is to enable purchasers to know in advance the consequences of purchasing decisions they make." 64 *Am. Jur.2d Public Utilities* § 62 (2001) (citing *W. Res., Inc. v. F.E.R.C.*, 72 *F.*3d 147 (D.C.Cir.1995)). If, for example, the only reference to SNET was relegated to the back of the calling card along with the dialing instructions and the card was encased in a vending machine, thereby making it inscrutable until after purchase, plaintiff would have been unable to determine to which of the numerous tariffs on file with the FCC she should turn for rate information. In those circumstances, plaintiff likely would have been forced to rely on BJ's representations concerning the terms of service offered by the card. Although the filed rate doctrine imputes knowledge to the consumer of the applicable tariffs once services are purchased, nowhere is it suggested that the doctrine requires a party to ferret out which filed tariffs may apply to a particular transaction.

Additionally, even if BJ's disclosed to plaintiff before the time of purchase that SNET was providing the actual phonecard

service, we must presume plaintiff had knowledge of the entire tariff, including the provision in the tariff that indicates SNET, "its agents and distributors, may from time to time offer promotions to Customers, including, but not limited to, complimentary Pre–Paid Phone Card Service." SNET America, Inc. Tariff FCC No. 3, § 4.4.2(c) (1997). Plaintiff, therefore, may have concluded that BJ's, a major wholesaler, had received a promotional offer from SNET and was passing its savings along to its club members. Alternatively, BJ's could have been selling the cards at a loss in a marketing effort, akin to that suggested in *BellSouth, supra,* to lure members into its warehouses or to attract new membership. In any event, on the record presented, we do not believe plaintiff's presumed knowledge of SNET's filed rates bars plaintiff's claim of ascertainable loss under the Consumer Fraud Act.

In sum, the facts, as alleged, suggest that BJ's had a direct role in the development of the point-of-sale marketing materials that it used to advertise its prepaid phone cards and that plaintiff and BJ's entered into a contractual relationship for those services completely separate from the terms offered under the filed tariff. In those circumstances, the filed rate doctrine does not present an absolute bar to recovery. The process of discovery may demonstrate that BJ's acted as an agent of SNET or played no role in marketing the prepaid cards other than lending its name to the packaging materials. In that event, BJ's may make a motion for summary judgment on the basis of the filed rate doctrine. On the present record, however, plaintiff's claim can go forward.

## IV.

For the foregoing reasons, we affirm the judgment of the Appellate Division and remand the case for further proceedings.

*For affirming*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN, and WALLACE—7.

*Opposed*—None.