969 A.2d 1069

LYLE REAL, PLAINTIFF–APPELLANT, v. RADIR WHEELS, INC.
AND RICHARD CONKLIN, DEFENDANTS–RESPONDENTS.

Argued January 21, 2009—Decided April 8, 2009.

512

*Michael D. Halbfish,* argued the cause for appellant (*Tunny & Halbfish,* attorneys; *Mr. Halbfish, B. David Jarashow,* and *John A. Tunney,* on the briefs).

*Clifford J. Weininger,* argued the cause for respondents.

Justice RIVERA–SOTO delivered the opinion of the Court.

The Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20, represents a legislative broadside against unsavory commercial practices. In this appeal, where an out-of-state consumer purchased a used automobile from an in-state seller via the internet, we are called on to determine whether the CFA's reach extends far enough to grasp that transaction.[1] The trial court determined that the in-state seller's actions sufficed to prove a private cause of action under the CFA and to trigger its civil remedies. The Appellate Division, however, reversed, ruling that the commercial activities of a casual seller of used automobiles do not fall within the CFA's private civil cause of action.

---

[1] We acknowledge that not many jurisdictions having a consumer fraud statute have considered the applicability of such laws to consumer sales facilitated on the internet, as occurred here. At least one state has amended its consumer protection statute clearly to reach such transactions. *See Cal. Bus. & Prof.Code* § 17500; *see also PETA v. California Milk Producers Advisory Bd.,* 125 *Cal.App.* 4th 871, 878–79, 22 *Cal.Rptr.*3d 900 (2005) (noting that California act's reference to "person" had never been limited to merchants, professional sellers, or business people). Other states have had to address so-called private consumer sales transactions based on the specific language and import of their respective statutes. *See, e.g., Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 *N.Y.*2d 20, 623 *N.Y.S.*2d 529, 647 *N.E.*2d 741, 745 (1995) (construing consumer protection statute, *N.Y. Gen. Bus. Law* § 349, to exclude transactions private in nature or "single-shot" transactions where language of statute declares unlawful "deceptive acts or practices *in the conduct of any business, trade or commerce*" (emphasis supplied)); *Milliken & Co. v. Duro Textiles, LLC,* 451 *Mass.* 547, 887 *N.E.*2d 244, 259 (2008) (construing language that "[u]nfair or deceptive acts or practices *in the conduct of any trade or commerce* are hereby declared unlawful," *Mass. Ann. Laws* ch. 93.A., § 2 (emphasis supplied), as requiring unfair practice to occur in "business context," thereby precluding liability for "strictly private transaction").

Because each statute's intended reach is unique to its jurisdiction, we approach the statutory construction question before us mindful only of the need to attempt to ascertain how the language of our own statute was intended to operate in this most modern of applications, regardless of the commercial medium used.

We conclude that the Appellate Division's application of the CFA was too narrow. The reach of the CFA's civil cause of action and remedies purposely is broad. By its explicit and unqualified terms, the CFA outlaws "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact ... in connection with the sale or advertisement of any merchandise or real estate[.]" *N.J.S.A.* 56:8–2. In this context, giving full expression to the plain words of that legislative mandate requires that the judgment of the Appellate Division be reversed and the judgment of the trial court be reinstated.

## I.

As developed at trial, the relevant facts are as follows. Plaintiff Lyle Real, a Missouri resident, sought to purchase a vintage Chevrolet Corvette over the internet. Ultimately, plaintiff came upon the following internet auction advertisement:

Vehicle Description[.]

1970 Corvette Convert[i]ble. Matching numbers, One owner Car, 350/300 HP 4 speed, Good Frame, New exh[au]st system, Power steering, Soft top is good. New Carpet. Runs Strong, Original rallys, Original radio/cassette. Title is original from 06/24 1970. If you have any Questions[,] please feel free to give us a call at [number removed]. Thanks and good luck!

Vehicle Condition[.]

Needs door hinge pins, Radiator support, original interior is ok but seats are a little worn. Painted once now has a few chips. Windshield has small crack in the lower left corner.

Terms of Sale[.]

10% deposit required within 5 days of auction close. Delivery options can be [discussed]. Payment in Full required within 10 days of auction close.

The e-mail address and telephone number listed on that advertisement both belonged to defendant Radir Wheels, Inc., a company wholly owned by defendant Richard Conklin.

Based on that advertisement, plaintiff bid $13,651 for the 1970 Corvette. After placing his bid but before the auction closed, plaintiff called the telephone number listed on the advertisement

and spoke with Conklin. After verifying the contents of the advertisement, plaintiff inquired whether the Corvette could be driven from defendants' location in New Jersey to plaintiff's home in Missouri. Conklin assured plaintiff that the Corvette was in good condition and could be driven from New Jersey to Missouri.

The auction closed, and plaintiff's bid was the winner. Plaintiff again contacted Conklin, only this time plaintiff was informed that it might not be safe to drive the Corvette from New Jersey to Missouri: the automatic headlights did not work (although they could be raised manually), the windshield wipers did not work, and the car lacked a spare tire. None of those defects was disclosed in the advertisement or in the earlier telephone conversation between plaintiff and Conklin. Plaintiff therefore elected to have the Corvette shipped to Missouri. Plaintiff paid for the Corvette with a check made payable to Conklin; plaintiff received the title to the car from Conklin, but in a Radir Wheels envelope.

Once the Corvette arrived in Missouri, plaintiff had it taken to a specialty repair shop for an examination. That examination revealed that the car's frame was rusted nearly in half, thereby disqualifying the Corvette from registration in Missouri; the convertible top was in poor condition; the seats were ripped in various places; the driver's seat frame was broken; the radio/tape player was not original equipment; the engine hesitated during acceleration; and the carburetor was out of tune. According to plaintiff, the description of the Corvette in the advertisement was "not even close" to the car delivered to him.[2] Plaintiff e-mailed digital photographs of the Corvette to Conklin via Radir Wheels's e-mail address, the only e-mail address Conklin had provided.

Plaintiff was steadfast: if he had known the true condition of the Corvette, he never would have purchased it. He noted that he paid over $13,000 for a car that was then worth from $5,000 to

---

[2] At trial, plaintiff presented an expert witness who corroborated plaintiff's claims concerning the Corvette's condition and opined further that the car, as delivered, was unsafe to drive.

$8,000. Also, plaintiff had to forego repairing the car himself because the necessary repairs were well beyond his abilities. Instead, in addition to the $13,651 purchase price, plaintiff paid in excess of $40,000 for professional work that rendered the car, once repaired, worth in the "$25,000 to $30,000 range."

The trial court, sitting without a jury, heard the proofs tendered by plaintiff. At the close of plaintiff's case, the trial court deferred Conklin's motion for "dismissal of the [CFA claim] on the ground that upon the facts and upon the law the plaintiff has shown no right to relief." *R.* 4:37–2(b). The trial court then received Conklin's testimony[3]—which asserted that he did not misrepresent the condition of the Corvette and that, in any event, he was not a "dealer" subject to the CFA's reach—as well as the testimony of an expert retained by Conklin. It ultimately ruled that all actions taken on the seller's behalf were Conklin's alone; it therefore dismissed plaintiff's claims against Radir Wheels. It also found that, despite Conklin's protestations and/or advertisements to the contrary, the Corvette did not have a solid frame; the engine did not "run strong[;]" the headlights and windshield wipers did not function; the seat covers were not worn, but torn; the Corvette had been owned by more than one person; and the radio was not original equipment. The trial court further found that Conklin qualified as a "dealer" under the CFA, and that his actions had been proved to have violated the CFA by clear and convincing evidence. It found that, although plaintiff's contract loss was $20,066.32, his ascertainable loss under the CFA[4] was

---

[3] For several reasons that are irrelevant to the issues joined, there was a significant delay between the end of plaintiff's case and the start of Conklin's case, and between the end of Conklin's case and the trial court's decision and entry of judgment.

[4] *See N.J.S.A.* 56:8–19 ("Any person who suffers any *ascertainable loss* of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction." (emphasis supplied)). *See also Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 248–49,

$8,651, representing the difference between the $13,651 plaintiff paid for the Corvette and the $5,000 value of what defendants delivered to plaintiff. As also provided in the CFA, the trial court trebled those damages to $25,953, and awarded $29,950 in attorneys' fees and $6,544.81 in costs.[5]

Conklin appealed, alleging that the trial court erred when (1) it concluded that, as a casual seller of used cars, Conklin nevertheless was subject to compliance with the CFA; and (2) it denied Conklin's motion to dismiss at the close of plaintiff's case because of a claimed failure of proof: that Conklin was a "dealer" of cars. Plaintiff cross-appealed, alleging that the trial court erred when it dismissed the claims against Radir Wheels. He also claimed that the trial court erred when it failed to enhance the attorneys' fees award.

In an unpublished decision, the Appellate Division affirmed in part, reversed in part, and remanded the case for the entry of a modified judgment. According to the panel, the primary vice in the trial court's determination was its consideration of the proofs tendered in the defense's case when evaluating whether an involuntary dismissal should have been entered at the close of plaintiff's case. It noted that a decision on a motion for judgment at the close of a party's case "may be reserved 'so long as the ultimate decision on such a motion is based only upon the [claimant]'s evidence.'" (quoting *Verdicchio v. Ricca*, 179 *N.J.* 1, 30 n. 4, 843 *A.*2d 1042 (2004)). It explained further that even in those instances, the moving party "is still entitled to a ruling 'on the adequacy of [claimant]'s proofs.'" (quoting *ibid.*). It repeated the

872 *A.*2d 783 (2005) (explaining that "ascertainable loss" within the meaning of the CFA means one that "is quantifiable or measurable" and that "[a]n 'estimate of damages, calculated within a reasonable degree of certainty' will suffice to demonstrate an ascertainable loss") (quoting *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 22, 647 *A.*2d 454 (1994)).

[5] *See N.J.S.A.* 56:8–19 (providing that, in CFA cases, "the court shall ... award threefold the damages sustained by any person in interest [and] shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit").

standard: " 'It goes without saying that a reviewing court faced with a R[ule] 4:37–2(b) issue must disregard evidence adduced on the defense case.' " (quoting *ibid.*). It therefore "conclude[d that] defendant's motion to dismiss plaintiff's [CFA] claim at the close of plaintiff's case should have been granted because there was no evidence that Conklin was a 'dealer' or 'merchant' under the CFA."

Having dismissed plaintiff's CFA claim, the panel nevertheless upheld the judgment against Conklin "based on the trial court's implicit finding of common law fraud." It therefore modified the judgment "to reflect an award of $8,651 against Conklin, i.e., the amount of compensatory damages found by the trial court." It also remanded the case so that, in light of the Appellate Division's shift in focus from the CFA to common law fraud, the trial court should "determine whether [Conklin] is liable for the payment of prejudgment interest[.]" In sum, the Appellate Division (1) "affirm[ed] [Conklin]'s liability for common law fraud and the award of damages in the amount of $8,651;" (2) reversed "the trebling of damages and the award of counsel fees and costs under the CFA[;]" and (3) remanded "the matter ... to the trial court to reconsider the costs to be awarded to plaintiff pursuant to R[ule] 4:42–8 and to determine whether plaintiff is entitled to receive prejudgment interest." [6]

We granted plaintiff's petition for certification, 196 *N.J.* 344, 953 *A.*2d 763 (2008), and, for the reasons that follow, we reverse the judgment of the Appellate Division and reinstate the judgment entered by the trial court.

## II.

Plaintiff asserts that the Appellate Division erred in several respects. He claims that the panel's interpretation of the CFA, requiring in these circumstances that the seller of a car be a

---

[6] The Appellate Division did not address the issues raised on plaintiff's cross-appeal.

"dealer," is not consonant with the plain language of that statute. He also argues that, even if the panel's interpretation was correct, Conklin nevertheless was subject to the CFA's reach because he qualified as a "dealer" under *N.J.A.C.* 13:45A. He urges that the Court ignore the procedural obstacle on which the Appellate Division focused, that is, what proofs may be considered and, conversely, what proofs must be ignored when considering a motion for judgment at the close of a party's case. Finally, he alleges that, by "applying the participation theory to pierce the corporate veil[,]" the Appellate Division also should have held Radir Wheels liable.[7]

### III.

#### A.

"The Consumer Fraud Act, originally enacted in 1960, is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." *Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 270, 390 *A.*2d 566 (1978). The CFA is "recognized to be remedial legislation which should be construed liberally." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 *N.J.* 372, 376 n. 1, 929 *A.*2d 1076 (2007) (citations omitted). It is designed to address "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." *Daaleman, supra,* 77 *N.J.* at 271, 390 *A.*2d 566. Further, the CFA

> has three main purposes: to compensate the victim for his or her actual loss; to punish the wrongdoer through the award of treble damages; and, by way of the counsel fee provision, to attract competent counsel to counteract the community

---

[7] Conklin made no separate response to plaintiff's petition for certification, relying instead "upon the briefs and appendices previously filed with the Superior Court of New Jersey, Appellate Division[.]"

scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual.

[*Lettenmaier v. Lube Connection, Inc.*, 162 *N.J.* 134, 139, 741 *A.2d* 591 (1999) (citations omitted).]

The scope of the CFA's proscriptions is both wide and deep. It provides that:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice[.]

[*N.J.S.A.* 56:8–2.]

It defines an "advertisement" to "include the attempt directly or indirectly . . . to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan[.]" *N.J.S.A.* 56:8–1(a). It states that "the term 'merchandise' shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale[.]" *N.J.S.A.* 56:8–1(c). It also expansively defines a "person" to "include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof[.]" *N.J.S.A.* 56:8–1(d).

The wide breadth of the Legislature's definition of the CFA's scope is reflected most clearly in the varied and eclectic contexts in which the statute has been applied. A cursory survey of CFA cases recently determined by this Court alone discloses that the CFA's remedial measures have been invoked in respect of the following examples: undisclosed document fee charges on new-car purchases, *Bosland v. Warnock Dodge, Inc.*, 197 *N.J.* 543, 964 *A.2d* 741 (2009); residential siding products, *Simmermon v. Dryvit Systems, Inc.*, 196 *N.J.* 316, 953 *A.2d* 478 (2008); overcharges in summary dispossess complaints, *Hodges v. Sasil Corp.*, 189 *N.J.* 210, 915 *A.2d* 1 (2007); overcharges on loan interest, *Muhammad*

*v. County Bank of Rehoboth Beach, Del.,* 189 *N.J.* 1, 912 *A.2d* 88 (2006); arbitration of mortgage claims, *Delta Funding Corp. v. Harris,* 189 *N.J.* 28, 912 *A.2d* 104 (2006); rent-to-own contracts, *Perez v. Rent–A–Center, Inc.,* 186 *N.J.* 188, 892 *A.2d* 1255, *motion for clarification granted,* 188 *N.J.* 215, 902 *A.2d* 1232 (2006), *cert. denied,* 549 *U.S.* 1115, 127 *S.Ct.* 984, 166 *L.Ed.2d* 710 (2007); car repairs, *Ryan v. American Honda Motor Co., Inc.,* 186 *N.J.* 431, 896 *A.2d* 454 (2006); car warranty claims, *Thiedemann, supra,* 183 *N.J.* at 234, 872 *A.2d* 783; carpet sales, *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 860 *A.2d* 435 (2004); and, pre-paid phone cards, *Smith v. SBC Commc'ns, Inc.,* 178 *N.J.* 265, 839 *A.2d* 850 (2004).

Although intentionally broad, the reach of the CFA is not without boundaries. We have explained that "a court must look to whether a 'real possibility' of conflict would exist if the CFA were to apply to a particular practice, regardless of the number of agencies with regulatory jurisdiction over that practice." *Lemelledo v. Beneficial Mgmt. Corp. of Am.,* 150 *N.J.* 255, 268, 696 *A.2d* 546 (1997). That analysis is informed by two seemingly competing concerns. First, we acknowledge "the understanding that the Legislature does not intentionally subject regulated entities to clearly conflicting administrative regimes." *Ibid.* Second, as a matter of statutory construction, we have defined that "[i]n determining whether the existence of other regulations creates an exception to the CFA for particular conduct that otherwise would fall within its provisions, it should ordinarily be assumed that the CFA applies to the covered practice." *Ibid.*

When determining whether activity presumptively within the ambit of the CFA nevertheless is exempt from its reach, the governing precept is as follows:

> In order to overcome the presumption that the CFA applies to a covered activity, a court must be satisfied ... that a direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at

cross-purposes. We stress that the conflict must be patent and sharp, and must not simply constitute a mere possibility of incompatibility. If the hurdle for rebutting the basic assumption of applicability of the CFA to covered conduct is too easily overcome, the statute's remedial measures may be rendered impotent as primary weapons in [combating] clear forms of fraud simply because those fraudulent practices happen also to be covered by some other statute or regulation. [*Id.* at 270, 696 A.2d 546.]

This context requires the recognition that, "[i]n the modern administrative state, regulation is frequently complementary, overlapping, and comprehensive." *Id.* at 271, 696 A.2d 546.[8]

The measured application of those principles has led to few, very limited exceptions to the CFA's reach. *See Daaleman, supra,* 77 *N.J.* at 272–73, 390 A.2d 566 (holding that CFA does not apply to public utility rates subject to Board of Public Utilities' exclusive rate-setting jurisdiction); *Macedo v. Dello Russo,* 178 *N.J.* 340, 345–46, 840 A.2d 238 (2004) (explaining that "our jurisprudence continues to identify learned professionals as beyond the reach of the [CFA] so long as they are operating in their professional capacities").[9]

---

[8] We have recognized the tension inherent in those circumstances. *Id.* at 271, 696 A.2d 546. ("Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the two statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation."). For that reason, "[i]t is not readily to be inferred that the Legislature, by enacting multiple remedial statutes designed to augment protection, actually intended that parties be subject only to one source of regulation." *Ibid.*

[9] In addition to the judicially crafted exceptions to its definitional sections, the CFA also has been held inapplicable, for example, in the following settings: claims under the Products Liability Act, *N.J.S.A.* 2A:58C–1 to –11, *Sinclair v. Merck & Co., Inc.,* 195 *N.J.* 51, 948 A.2d 587 (2008); fraud on the market claims, *Int'l Union of Operating Eng'rs, supra,* 192 *N.J.* at 372, 929 A.2d 1076; refusal to service domestically vehicles purchased abroad, *Wilson v. General Motors Corp.,* 190 *N.J.* 336, 921 A.2d 414 (2007); sale of bulk tax sale certificates was not a per se violation of the CFA, *Varsolona v. Breen Capital Servs. Corp.,* 180 *N.J.* 605, 853 A.2d 865 (2004); claims preempted by federal law, *Glukowsky v. Equity One, Inc.,* 180 *N.J.* 49, 848 A.2d 747 (2004); claims subject to the filed rate doctrine, *Smith, supra,* 178 *N.J.* at 265, 839 A.2d 850; and, disclosure claims under the New Jersey Real Estate Residential Off–Site Conditions Disclosure Act, *N.J.S.A.*

The aggregate of those principles informs the resolution of the question presented in this appeal: whether the CFA applies to plaintiff's particularized claim that defendant violated the CFA in misrepresenting the condition of the Corvette in order to sell it to plaintiff. In doing so, we look first to the canons that govern our interpretation of the CFA.

### B.

We start on familiar ground. Because this appeal "presents an issue of statutory interpretation, 'a question of law that we review de novo[,]'" *In re Liquidation of Integrity Ins. Co.*, 193 *N.J.* 86, 94, 935 *A.*2d 1184 (2007) (quoting *Toll Bros., Inc. v. Twp. of W. Windsor*, 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002)), our task is well-defined:

> [w]hen interpreting a statute, our overarching duty is to construe and apply the statute as enacted. We do so by applying the following principles. First, a court should not resort to extrinsic interpretative aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation. That said, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. We have explained that we may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. We are guided by first principles: our analysis . . . begins with the plain language of the statute.
>
> [*Daidone v. Buterick Bulkheading*, 191 *N.J.* 557, 565–66, 924 *A.*2d 1193 (2007) (citations, internal quotation marks and editing marks omitted).]

With those principles as our guide, we turn to their application here.

### C.

Section 2 of the CFA prohibits certain acts performed by "any person," *N.J.S.A.* 56:8–2, and the statutory definition of "person," *N.J.S.A.* 56:8–1(d), is sufficiently expansive to ensnare defendant. Further, defendant cannot claim that he is member of a regulated

46:3C–1 to –12, *Nobrega v. Edison Glen Assoc.*, 167 *N.J.* 520, 772 *A.*2d 368 (2001).

industry or of a learned profession and, hence, he does not qualify for exemption from the CFA's reach. In sum, then, as a plain matter of statutory interpretation, the conclusion that the CFA governs defendant's conduct in this case is inescapable and, if that were the sole matter at issue, our task would be at an end. However, the parties raise contentions that require additional examination, which we now address.

In respect of the CFA's scope, this case posits contradictory claims. Relying principally on *Strawn v. Canuso*, 140 *N.J.* 43, 657 *A.*2d 420 (1995), Conklin asserts that he is not a "dealer" of automobiles and, hence, is not subject to the CFA, while plaintiff claims that Conklin qualifies as a "dealer" and thus should be subject to the CFA. In *Strawn*, a group of home purchasers sued a series of home builders and home-selling brokers, alleging that the failure of the builders and brokers to disclose the existence of a nearby closed landfill violated, among other things, the CFA. *Id.* at 49–51, 657 *A.*2d 420. Although the Court "limit[ed its] holding to professional sellers of residential housing (persons engaged in the business of building or developing residential housing) and the brokers representing them[,]" *id.* at 59, 657 *A.*2d 420, that limitation applied only to the imposition of a duty to disclose off-site defective conditions that materially affect the value of the property to prospective purchasers of residential real estate, and not to the viability of a CFA claim in those circumstances. In respect of the imposition of liability under the CFA, and consistent with the CFA's broad application, *Strawn* categorically states that "[r]eal estate brokers, agents, and salespersons representing professional sellers of real estate *are subject to the provisions of the [CFA]*." *Id.* at 60, 657 *A.*2d 420 (emphasis supplied). Nothing in *Strawn* supports the proposition Conklin advances.

*Strawn* aside, the focus of the counter-arguments advanced both by plaintiff and Conklin is simply misplaced. For purposes of determining whether the CFA applies, it is immaterial whether Conklin was a "dealer," a label that has relevance in this

context solely within the meaning of *L.* 1995, *c.* 373, § 1 to § 14, titled "An Act concerning the sale and warranty of certain used motor vehicles and supplementing *P.L.* 1960, *c.* 39 (C. 56:8–1. et seq.)" (commonly known as the Used Car Lemon Law) (codified at *N.J.S.A.* 56:8–67 to –80). Moreover, the question is answered directly by the stark words of section 9 of that statute: "Nothing in this act shall in any way limit the rights or remedies which are otherwise available to a consumer under any other law." *N.J.S.A.* 56:8–75. Tellingly, the Public Law referenced by the Used Car Lemon Law is the CFA itself. Thus, by its own explicit terms, the Used Car Lemon Law never was intended to substitute for the CFA; on the contrary, it is additive, intended to supplement the CFA's "rights and remedies." For that reason, whether Conklin was a "dealer" within the meaning of the Used Car Lemon Law simply is irrelevant.[10]

Even if the provisions of the Used Car Lemon Law had any application here, our conclusion remains unaltered: Conklin is subject to liability under the CFA. That must be so because, by the very terms of the Used Car Lemon Law, it and the CFA supplement each other, and are not preemptive one of the other. That conclusion must follow as "[t]he presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud." *Lemelledo, supra,* 150 *N.J.* at 270, 696 *A.*2d 546.

Because no statutory or regulatory regime—akin to those governing public utilities or regulated learned professions—purports to govern the sale of used cars to the exclusion of all others, there is no exception to the CFA's reach that is applicable here. For that reason, we return to our original point of departure: a

---

[10] In light of this conclusion, it is unnecessary to consider whether the trial court erred in using evidence adduced after plaintiff rested his case in determining whether Conklin was a "dealer." That issue is moot.

straightforward analysis of the CFA's application to the facts of this case.

 In conclusion, plaintiff charged, and the trial court found by clear and convincing evidence, that Conklin intentionally had engaged in unconscionable commercial practices in connection with the advertisement and sale of merchandise. There also is no doubt that Conklin himself satisfies the statutory definition of "person" and the Corvette satisfies the statutory definition of "merchandise." Finally, plaintiff proved, and the trial court also found, that he had suffered an ascertainable loss. On the whole, then, plaintiff pled and proved a textbook claim under the CFA. Nothing more was needed to invoke the CFA's broad remedial purposes.[11]

### IV.

The judgment of the Appellate Division is reversed, and the judgment of the Law Division is reinstated in all respects.

*For reversal and reinstatement*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.

---

[11] Plaintiff also claims that the trial court erred when it dismissed Radir Wheels as a party defendant. The trial court found that "the ultimate sale was by Mr. Conklin and not by Radir Wheels and, therefore, the case against Radir Wheels will be dismissed without costs." Those factual findings by the trial court are entitled to deference so long as they are supported by sufficient credible evidence. *State v. Chun*, 194 *N.J.* 54, 88, 943 *A.*2d 114 (2008) (citing *State v. Locurto*, 157 *N.J.* 463, 472, 724 *A.*2d 234 (1999); *State v. Johnson*, 42 *N.J.* 146, 158–59, 199 *A.*2d 809 (1964)); *F.B. v. A.L.G.*, 176 *N.J.* 201, 211, 821 *A.*2d 1157 (2003). Plaintiff has made no showing that the trial court's findings were not so supported; our independent review of the record reaffirms the propriety of those findings. We, therefore, reject that challenge.