**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3686-23

CELTIC BANK CORPORATION,

    Plaintiff-Respondent,

v.

NORTHWESTERN RESIDENCE,
INC., DARO MABEL REALTY
LLC, MENDARO LARGOZA,
and MARIA LARGOZA,

    Defendants-Appellants,

and

FE M. CALIOLIO,

    Defendant.

_____

Submitted December 8, 2025 – Decided March 24, 2026

Before Judges Natali and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Sussex County, Docket No. F-000259-23.

Kilcommons Law, PC, and Hardesty Law Group, PC, attorneys for appellants (Kevin M. Kilcommons and Leonard J. C. Hardesty, Jr., on the brief).

Gordon Rees Scully Mansukhani LLP, attorneys for respondent (Ronald A. Giller and Keith E. Sharkin, on the brief).

PER CURIAM

The matter arises out of a foreclosure action initiated by plaintiff Celtic Bank Corporation (Celtic) in which defendants Mendaro Largoza, M.D., Maria Largoza, M.D. (the Largozas), Daro Mabel Realty, LLC (Daro Mabel), and Northwestern Residence, Inc. (Northwestern), (collectively, defendants), asserted in response thirteen counterclaims, grounded in causes of action for fraud, misrepresentation, and other contract-based claims. After the court dismissed those counterclaims, and defendants' motion for partial summary judgment, it granted Celtic's application for summary judgment and, in turn, a final judgment of foreclosure.

Defendants now appeal from the following orders:  (1) a June 20, 2023 order which granted Celtic's motion to dismiss defendants' counterclaims for failure to state a claim under Rule 4:6-2(e); (2) a separate June 20, 2023 order which denied defendants' motion for partial summary judgment; (3) a September 11, 2023 order which granted Celtic's motion for summary judgment; and (4) a

June 12, 2024 order which granted Celtic's motion for final judgment of foreclosure. Based, in part on the reasons expressed by the court in its June 20, 2023 and September 11, 2023 written decisions, and also the foregoing analysis, we affirm.

I.

For convenience to the reader, we restate the relevant facts underlying the parties' dispute as set forth in our prior opinion, supplemented by those additional facts from the record and the subsequent procedural history. Largoza v. FKM Real Est. Holdings, Inc., 474 N.J. Super. 61, 62-73 (App. Div. 2022). We recite the facts in greater granularity than we typically would because we consider it necessary for an informed understanding of the issues raised by the parties.

Underlying Transactions

Roland David (David) introduced the Largozas to an investment opportunity in 2017 which contemplated the purchase of a residential healthcare facility (RHCF) in Newton. The facility, called the Merriam House, was owned by Fe M. Caliolio (Caliolio), an acquaintance of David, who wanted to sell the property to medical professionals and retire. The proposed sale included both the real property in Newton (Merriam Property), and the RHCF business

3

(Merriam Business). The property had previously been transferred among related corporations managed by Caliolio, including Happy Valley Manor, FLK Realty, and FKM Real Estate Holdings, Inc.

In their effort to entice the Largozas, David and Caliolio presented an appraisal prepared by Clifford Greenfield (Greenfield Appraisal), which estimated the combined value of the Merriam Property and Business at $3,600,000, and forecasted "an upward potential" value of $8,640,000 with future expansion. The Largozas contend (and the parties agree) that the Greenfield Appraisal, as well as other supporting financial information, was prepared under false and fraudulent pretenses to make the property and business appear far more valuable than their true market value.

On March 17, 2018, FKM through Caliolio and the defendants executed a Contract for Sale of Real Estate which conveyed the Merriam Property for $2,500,000. The Largozas previously tendered a $50,000 deposit to Ernest G. Ianetti, Esq. (Ianetti) who shared an office with David, and represented the Largozas in the transaction. Paragraph six of the contract required defendants to make a "good faith effort" to obtain a Small Business Administration (SBA) loan of $2,250,000 to finance the transaction. Caliolio and the Largozas also

executed a Contract for Sale of Business which conveyed the Merriam Business to the defendants for $150,000.

Financing through Celtic

After execution of the contracts in 2018, the Largozas, assisted by David and Paul Messina, an experienced loan broker, applied for an SBA 7(a) loan from Celtic in the amount of $2,125,000, as memorialized in a loan commitment agreement between the Largozas and Celtic. Celtic is designated as an SBA Preferred Lender, authorized to conduct its own internal review and approve loans subject to SBA regulations.

In accordance with the terms of the loan commitment agreement and as part of the loan approval process, Celtic retained Cushman & Wakefield to independently appraise the Merriam Property. Largoza, 474 N.J. Super. at 67. Cushman appraised the property as an assisted living facility and valued the property at $2,700,000. Ibid. Defendants allege Celtic inappropriately instructed Cushman to appraise the property as an assisted living facility (ALF) and assert the appraised value would have been significantly lower had it been correctly valued as a RHCF. Ibid. An underwriter for Celtic later reviewed the Cushman appraisal and suggested adjusting the value downward to $2,370,000.

5

Ibid. Defendants maintain, however, that Celtic never disclosed this adjustment to them. Ibid.

On November 30, 2018, the Largozas, on behalf of Northwestern and Daro Mabel, executed a U.S. Small Business Administration Note (note) in the principal amount of $2,125,000. The note had an initial interest rate of eight percent and defendants were required to make monthly payments of principal and interest in the amount of $16,406.62. Every quarter, the interest rate was to be adjusted based on the prime rate of interest reported in the Wall Street Journal plus an additional 2.75 percent. In the event of nonpayment, the note permitted Celtic to charge a late fee of up to five percent of the unpaid sum. The note also contained an acceleration clause which permitted Celtic, in the event of default, to demand the immediate payment of all outstanding amounts.

To secure the note, the Largozas, on behalf of Northwestern and Daro Mabel, executed a mortgage, which was duly recorded and pledged the Merriam Property as collateral. The mortgage contained a similar acceleration clause to that expressed in the note. The mortgage also entitled Celtic to "obtain a judicial decree foreclosing [d]efendants' interest in all or part of the" Merriam Property. The Largozas also personally guaranteed repayment of all amounts under the

A-3686-23

note in a separately executed guarantee, which pledged additional personal property as collateral.

In November 2019, a former employee of the business advised defendants that David and Caliolio had been stealing from the company. Largoza, 474 N.J. Super. at 68. Defendants claim their investigation confirmed these allegations and exposed misrepresentations, which they contend induced them into purchasing the Merriam Property. Ibid. Defendants further contend their audit of the business uncovered that Caliolio and David defrauded them into executing two additional notes for a total of $1,400,000. Id. at 68-69.

Defendants thereafter filed an eighteen-count complaint against several third-parties not present in the matter before us, but the complaint also included a negligent misrepresentation claim against Celtic. Id. at 69. Defendants filed a first amended complaint that added an equitable fraud claim against Celtic seeking rescission of the loan agreement due to Celtic's alleged overinflation of the property's value. Ibid. Defendants then filed a third amended complaint in November 2021, alleging eleven new claims against Celtic and repleading the two original claims. Ibid. Celtic sent defendants a letter contending their new claims were similarly frivolous and violated Rule 1:4-8. Id. at 70. Significantly, Celtic also asserted, for the first time, defendants' "contract" claims failed, in

part, because the forum selection clause required claims arising from the loan agreement to be adjudicated in Utah. Ibid. It thereafter filed a second Rule 4:6-2(e) motion and sought sanctions under Rule 1:4-8(b) and N.J.S.A. 2A:15-59.1. Ibid.

Following oral argument, the court concluded the forum selection clause applied to all defendants' causes of action against Celtic and entered an order dismissing defendants' claims. Ibid. Defendants filed a motion for reconsideration and argued the court erred in enforcing the forum selection clause because the contract between the parties was illegal from the beginning and therefore void. Id. at 71. They also asserted enforcing the clause, particularly as to their conspiracy claims, would result in piecemeal litigation contrary to the entire controversy doctrine. Ibid. Among other arguments, defendants further argued Celtic waived its rights under the clause by belatedly objecting to jurisdiction and failing to raise the argument in their initial motion to dismiss. Ibid.

After considering the parties' oral arguments, the court entered an order denying defendants' application. Ibid. As to the entire controversy doctrine, the court explained defendants had not asserted their claims against Celtic in a prior action, and Celtic was dismissed on jurisdictional grounds, not after an

adjudication on the merits.  Ibid.  The court did not expressly address, in its oral decision or written opinion, defendants' contention that Celtic waived its rights under the forum selection clause.  Id. at 72.

Defendants thereafter filed a motion for leave to appeal, which we granted and, in doing so, limited our review to the "issues of jurisdiction, the forum selection clause, and the entire controversy doctrine."  Ibid.  Among other conclusions, we held remand was required for the trial court to make factual findings and legal conclusions to determine if Celtic waived its right to enforce the forum selection clause.  Id. at 87.  On remand, after considering oral arguments and holding a virtual hearing, the court issued an April 6, 2023 order and determined "that the forum selection clause as set forth . . . in the contract/loan agreement between [defendants] and Celtic . . . is enforceable by Celtic . . . and was not, and has not been waived."[1]

---

[1]  The court's June 20, 2023 order, from which defendants appeal, stated defendants' counterclaims had been previously dismissed "without prejudice based on a forum selection cause" and were thus "being considered for the first time without any bar."  We note neither party argues before us that defendants' counterclaims are, to any extent, affected by the forum selection clause.  We accordingly do not address that issue as it was neither raised nor briefed by the parties.  See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026) ("It is, of course, clear that an issue not briefed is deemed waived.").

Foreclosure Action

While the parties awaited further direction on the forum selection clause issue, Celtic commenced the current two-count foreclosure action currently before us in the Chancery Division. Celtic alleged defendants failed to make payments "from April 30, 2021 through the date of this filing" and sought to foreclose upon the Merriam Property under the above-described terms of the note and mortgage.

Under count one, foreclosure, Celtic demanded a judgment which: (1) fixed the amount due on the note to Celtic; (2) directed Celtic be paid the amount due in addition to interests and costs; (3) declared the interest of the defendants and others subordinate to Celtic's interests; (4) the Merriam Property be sold to satisfy the amount due; (5) foreclose and bar defendants of all equity of redemption; (6) award attorneys' fees and costs, among other relief. Under count two, possession, Celtic demanded it or a purchaser at a Sherrif's sale be awarded possession of the Merriam Property and attorneys' fees and costs, among other relief.

Defendants filed a contesting answer which denied many of Celtic's allegations and asserted various defenses. Defendants claimed the mortgage and note were procured by fraud and therefore void. Defendants also argued they

10

complied with the note and the mortgage but maintained Celtic refused to accept payment once defendants filed an action in the Law Division.

Defendants also asserted thirteen counterclaims, many of which had been previously asserted in the previous matter, but, as noted, were dismissed pursuant to the forum selection clause. As factual background for their counterclaims, defendants summarily claimed David and Messina "facilitated the . . . application for an SBA loan," and "were instrumental in tendering documents [and] manipulating the underwriting and approval process." Defendants contended, without their knowledge or consent, "Caliolio and David tendered false or fictitious financial information to Celtic . . . and Cushman to substantiate the value of the Merriam Property and Merriam Business" including: (1) rent rolls which contained deceased or previously discharged tenants; (2) forged documents; and (3) the "Greenfield Appraisal" which defendants claim was "prepared under false or fraudulent pretenses" and valued the "Merriam Property based on its comparison to other [ALFs]."

In addition to the other tax and financial documents submitted or prepared by Caliolio, David, and Messina, defendants asserted Celtic also "reviewed the Greenfield [a]ppraisal and included it in the internal loan application package" but "required a second, independent appraisal," for which they retained

11

Cushman. Defendants maintained the Cushman Appraisal, however, improperly valued the Merriam Property as an ALF, despite the Merriam Property being a "stand-alone licensed [RHCF]," which caused a material difference in valuation. They also contended tax returns submitted by Caliolio and David "contained numerous inconsistencies which are believed to be indicative of fraud and were used in the Greenfield Appraisal, the Cushman Appraisal, and by Celtic . . . in its underwriting process." Additionally, they argue Cushman should have known the facility was not an ALF due to differences in the units available for rent, specifically the lack of kitchenettes.

Next, defendants detailed various facts which, they claim, support that Celtic aided and abetted the conspiracy and issuance of a fraudulent note and mortgage. They maintain Celtic led them to "believe that since they were purchasing a [RHCF], they were eligible for financing under the SBA 7(a) loan program." Defendants further contend Caliolio and David submitted fraudulent documents, including forged checks, as evidence of an earnest money deposit and also altered financial records to show defendants' liquidity.

Defendants also maintain Celtic, as an experienced lender in the ALF industry, should have known it was required to comply with SBA Standard Operating Procedures (SOPs), and further should have known "[t]he Merriam

A-3686-23

Property and the Merriam Business operated a stand-alone [RHCF]." Defendants contend Celtic prepared and submitted documents incorrectly labeling the Merriam Property and Merriam Business as an ALF.

With respect to the appraisal conducted by Cushman, defendants stated Celtic gave Cushman specific instructions to appraise the Merriam Property and Merriam Business as an ALF, which drastically overvalued the property. They also contend Cushman's $2,700,000 appraisal value was adjusted downward by Celtic to $2,370,000 and, therefore, "the fair market value from Celtic['s] . . . viewpoint was substantially less than the contingency amount set forth in the [l]oan [c]ommitment [a]greement." Defendants argue Celtic was required to disclose this adjustment, which it failed to do. Defendants assert Celtic falsified documents in order to have the SBA loan approved.

In light of these allegations, defendants asserted the following counterclaims: (1) aiding and abetting; (2) negligent misrepresentation; (3) equitable fraud–recission; (4) fraudulent misrepresentation; (5) breach of contract; (6) breach of the duty of good faith and fair dealing; (7) violation of the Consumer Fraud Act (CFA); (8) void ab initio; (9) voidable; (10) unjust enrichment; (11) tortious and intentional interference with contractual relations;

13

(12) negligent interference with contractual relations; and (13) fraudulent inducement.[2]

Motion to Dismiss and Partial Summary Judgment Decision

On May 2, 2023, Celtic filed a motion to dismiss defendants' counterclaims for failure to state a claim under Rule 4:6-2(e). In support of its motion, Celtic included a certification from its counsel along with the following exhibits attached to the pleadings: (1) the November 30, 2018 SBA note between the parties, (2) a business loan agreement between the parties of the same date, (3) the mortgage entered into by the parties, (4) an "unconditional guarantee" entered into by Celtic and defendant Maria Largoza, (5) defendants' amended contested answer in foreclosure asserting affirmative defenses and counterclaims, and (6) the court's earlier orders and transcripts related to the resolution and remand in Largoza v. FKM Real Est. Holdings, Inc., 474 N.J. Super. 61 (App. Div. 2022).

---

[2] Defendants also asserted twenty-three crossclaims against various third-party defendants. In Celtic's Rule 4:46-2(b) counterstatement of material facts, it stated "[n]one of the third-party [d]efendants have been served or made an appearance in this matter." The status of defendants' third-party claims is unclear from the record as the court did not address the third-party claims in the three orders on appeal. Defendants, however, state in their brief before us, that they voluntarily dismissed the third-party complaint on August 16, 2024. In light of defendants' concession and the fact that issues on appeal do not pertain to the third-party claims, we decline to address them.

In response, defendants cross-moved for partial summary on their counterclaims for negligent misrepresentation, equitable fraud, breach of contract, breach of good faith and fair dealing, violation of the CFA, and fraudulent inducement. In support of their application, defendants submitted several proofs attached to its pleadings, including: (1) the SBA SOPs, which provided that an RHCF was not eligible for an SBA 7(a) loan; (2) the license of the facility that defendants maintain indicates they purchased a RHCF; (3) the loan commitment contract, (4) the internal Cushman appraisal report that valued the real property at a decreased $2.27 million; and (5) Celtic's admissions to defendants' statement of material facts, which defendants claim demonstrated Celtic did not inform defendants of the complete results of the appraisal and further did not provide them a copy of the internal report that resulted in the downward valuation.

As noted, the June 20, 2023 orders were accompanied by a single fifty-page written decision. Also, as noted, the court granted Celtic's motion to dismiss all thirteen of defendants' counterclaims and denied defendants motion for summary judgment as to counts two, three, five, six, seven, and thirteen. The court laid out the appropriate standard for a motion to dismiss, relying on Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989)

and noted "the motion to dismiss should be approached with great caution and should only be granted in the rarest of instances."

The court next addressed the fraud and misrepresentation claims in counts two, three, four, seven, and thirteen. It concluded defendants had conceded Caliolio, David, and Messina submitted and prepared relevant financial and tax documentation on their behalf, including the Greenfield appraisal. It concluded these admissions were "critical" for two reasons: (1) Caliolio, David, and Messina were acting on behalf of the defendants as agents in obtaining financing for the Merriam Property; and (2) Celtic had "reasonably relied on the misinformation in those documents in its evaluation for the loan eligibility." Thus, the court found "defendants cannot hold [Celtic] liable for a misrepresentation that was based on information [d]efendant[s] provided to [Celtic] by way of [their] agents," they have "not sufficiently pled a misrepresentation, [and] all claims based in equitable and legal fraud must fail."

Next, because Celtic was "not presumed to owe a fiduciary duty to [d]efendants, as their interests in the transactions are oppositional," the court considered defendants' assertion that the third exception set forth in United

Jersey Bank v. Kensey, 306 N.J. Super. 540, 551-53 (App. Div. 1997) applied.[3] Because the loan commitment document did "not preclude Celtic . . . from adjusting the valuation of the appraisal," it found the third exception did not apply.

Under the second Kensey exception, the court concluded the appraisal adjustment was not "'so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling.'" (quoting Kensey, 306 N.J. Super. at 554). It reasoned that nothing in the "pleadings shows that [d]efendants asked to see the Cushman Appraisal or later valuations" and, "a bank does not owe a borrowed a duty to inform a borrower the value of a property" and, therefore, "[d]efendants have not provided an explanation as to why the [c]ourt should hold Celtic . . . to a higher standard than the accepted norms as set forth in New Jersey jurisprudence."

---

[3] In Kensey, our court articulated exceptions to the general rule that "creditor-debtor relationships rarely give rise to a fiduciary duty." Kensey, 306 N.J. Super. at 552. Those three exceptions are: (1) where a fiduciary relationship is legally extant, as in transactions between a principal and agent or an attorney and client; (2) where either party entering into the contract "expressly reposes" a trust and confidence in the other, also known as the "swindling" exception; or (3) where the transaction is "intrinsically fiduciary" in nature. Kensey, 306 N.J. Super. at 551.

A-3686-23

In light of these conclusions, and "because all of the alleged misrepresentations and purported fraud by [Celtic] arose from misinformation provided by [d]efendants, by way of agents, and because the counterclaim's [did] not state claims upon which relief may be granted," the court dismissed counterclaims two, three, four, seven, and thirteen. It also denied defendants' motion for summary judgment as to counterclaims two, three, seven, and thirteen.

The court further concluded, with respect to the counterclaim that alleged Celtic "aided and abetted in the alleged conspiracy to defraud [d]efendants into taking out an improper loan," that "there [were] no allegations or evidence before the [c]ourt that would suggest [Celtic] knew of the wrongful conduct in providing defendants with a loan." It explained that "New Jersey does not impose a duty upon a lender to investigate paperwork submitted where the lender has not been presented with facts that would raise suspicion." Thus, it dismissed the counterclaim for aiding and abetting.

Next, the court dismissed counterclaim eleven for tortious interference. In doing so, it found any alleged "interference . . . cannot be considered intentional, as the reliance upon [Caliolio, David, and Messina's] representations was reasonable" and "the pleadings do not show that [Celtic] intentionally

interfered with the . . . contract."  With respect to counterclaims five and six for breach of contract and breach of good faith and fair dealing, it found "[t]he broad conclusory allegations of [c]ount V . . . are not sufficient to demonstrate that there was a breach of contract, because [d]efendants . . . failed to show which contract was breached or how [p]laintiff breached the subject contract."  And, it found the "alleged improper valuation from the appraisal . . . are all the result of risks assumed by [d]efendants when [d]efendants submitted misinformation to" Celtic and, therefore, defendants did not sufficiently plead a cause of action for breach of the duty of good faith and fair dealing.

The court noted it earlier dismissed counterclaims one, two, three, four, seven, eleven, and twelve on the merits but engaged in a brief discussion of the economic loss doctrine.  It stated it did "not agree with [d]efendants that the claims are revived because fraud caused the implementation of the contract" because "the purported fraudulent misrepresentations were all caused by misinformation provided by [Caliolio, David, and Messina] while acting on behalf and with the permission of [d]efendants."  It also noted Celtic did not have a duty to investigate the documents submitted because there is no allegations to demonstrate the documents made Celtic suspicious of their

veracity. Thus, the court concluded "[d]efendants tortious causes of action are all barred by the economic loss doctrine."

The court further concluded that Celtic was not unjustly enriched under count ten. In doing so, it reasoned defendants' argument that any benefit received by Celtic was undue because the contract was invalid was unpersuasive as Celtic received only "the expected return based on the terms of the contract" which was entered into based on information provided by defendants. Further, with respect to defendants' counterclaims of void ab initio, voidable, and negligent interference, it concluded "New Jersey does not recognize [these] causes of action" and accordingly dismissed them.

Turning to defendants' motion for summary judgment, the court denied defendants' application with respect to disgorgement because such an "equitable claim . . . is only available where a claim of unjust enrichment has been proven." In light of its decision to dismiss defendants' claim for unjust enrichment, it accordingly denied defendants' motion for summary judgment on the grounds of disgorgement. It also rejected defendants' argument for summary judgment that Celtic's response to their statement of material facts was "insufficient and thus . . . deemed an admission to all facts."

20

Finally, the court denied Celtic's application for sanctions against defendants for filing a frivolous motion because "the arguments presented . . . are being considered for the first time without any bar of collateral estoppel or res judicata." As noted, to the extent the claims had been considered in the April 6, 2023 order stemming from the remand in <u>Largoza</u>, 474 N.J. Super. at 87, the court stated they had been dismissed "without prejudice based on a forum selection cause."

<u>Celtic's Motion for Summary Judgment</u>

Celtic also moved for summary judgment and supported its application with an affidavit of Brian Zern, Celtic's Executive Vice President of Loan Servicing and Special Assets, which detailed the terms of the note and stated the defendants failed to comply with their payment obligations and have not cured their default. In its <u>Rule</u> 4:46-2(a) statement of material facts, Celtic detailed the specifics of the underlying transaction, the claims asserted, and stated that "[d]efendants . . . asserted a variety of [t]hird-[p]arty claims against a number of other parties" but "[n]one of the third-party [d]efendants [had] been served or made an appearance in this matter." It also stated defendants "failed to comply with their payment obligations under the [n]ote, . . . defaulted[,] . . . have not

made any payment on the [n]ote since June 8, 2021[, and] . . . have not cured their [d]efault."

In opposition, defendants submitted a Rule 4:46-2(b) counterstatement of material facts which stated "Celtic . . . was aware of the failure of the real property to appraise at the valuation requirements and failed to disclose this to [d]efendants." They also explained the SBA SOPs rendered the Merriam Property and Merriam Business ineligible for an SBA 7(a) loan because it was licensed as a RHCF. Defendants also submitted a response to Celtic's statement of material facts in which they contested numerous assertions, and Celtic submitted a response to defendants' Rule 4:46-2(b) counterstatement in which it stated certain of defendants' assertions were not material to the motion or contained legal conclusions.

The court considered the motion on September 8, 2023 and issued a written decision and conforming order three days later and granted Celtic's motion for summary judgment. It concluded defendants did not sufficiently demonstrate that there was a "genuine issue of material fact as it relates to the eligibility of the loan issued by" Celtic because the court had "previously held that [Celtic] is not liable for misrepresentations based on information" defendants provided to it. It also concluded, with respect to breach of contract,

22

defendants again failed to establish there are genuine disputes of material fact because "[d]efendants have failed to show which contract was breached or how [Celtic] breached the subject contract."  It noted defendants entered into the contract but "did not claim there were any issues with the loan until they were required to pay back the loan."

Next, the court concluded "there were no material misrepresentations made by [Celtic] and that [Celtic] did not owe a duty to disclose to defendants." It further found "no genuine issue of material fact[] . . . exists as to the execution of the [m]ortgage, [n]ote, and [g]uarantee loan agreements," defendants' default, and Celtic "demonstrated its prima facie right to foreclose."  Thus, it granted Celtic's motion for summary judgment but denied its application for sanctions against defendants.

Foreclosure Judgment

On April 16, 2024, Celtic moved for entry of final judgment.  In support of its motion, Celtic submitted an affidavit of amount due, which detailed the terms of the mortgage and contended defendants owed Celtic $2,926,754.93 which included outstanding principal, unpaid interest, unpaid late fees, legal fees, per diem interest, and other expenses.

Defendants filed opposition and requested a hearing. In opposition, defendants contended the amount due was a misrepresentation, Celtic's "submission [did] not meet the statutory requirements for the issuance of a final judgment in foreclosure," and Celtic refused to accept a July 2021 payment which would have made the loan current. They also stated Celtic refused to accept December 2023 proceeds of an insurance claim on the property. Defendants further maintained Celtic charged them with "forced placed insurance" even though defendants informed Celtic they obtained insurance for the property. In addition, defendants again stated Celtic breach the duty of good faith and fair dealing and argued they were entitled to reduced loan obligations due to COVID-19.

As noted, the court granted, in part, Celtic's motion for entry of final judgment. Specifically, it ordered the "mortgaged premises be sold to raise and satisfy the moneys due [to Celtic]" but rejected Celtic's calculation that it is owed $2,926,754.93 plus additional attorneys' fees. It further found "the [n]ote explicitly provides that [Celtic] may demand all payments due . . . [and Celtic] was under no obligation to accept partial payments." Next, with respect to the forced placed insurance policy, it concluded defendants did not "demonstrate[]

24

that they provided notice of new insurance after the receipt of the cancellation notice, and thus, the $22,075 should remain part of the judgment."

The court also afforded Celtic a credit in the amount of the insurance claim and deducted the claimed amount for attorneys' fees, as Celtic did not provide a "certification of services in support of its request for attorney's fees." Additionally, it concluded "[d]efendants' assertion related to the possibility that it could have received governmental assistance fails as it is speculative and without any supporting evidence." Thus, it concluded Celtic was owed $2,680,827.41 and issued judgment in that amount in its June 12, 2024 order and corresponding written decision. This appeal followed.

II.

A.

With respect to the dismissal of their counterclaims, defendants maintain the following arguments. First, defendants argue the "court erred in dismissing the fraud and misrepresentations claims" in its counts two, three, four, seven, and thirteen and assert the court incorrectly concluded Celtic relied on false documents submitted by defendants in evaluating their eligibility for the SBA loan. Defendants contend they "did not submit false or misleading information" to Celtic and that "[a]ny misinformation submitted from third parties was done

without [their] knowledge or approval" because "[d]efendants were victims of fraud by these third parties, in conspiracy with" Celtic. They further maintain Celtic should have immediately rejected their loan application, the court "failed to explain how and why the misclassification from a RCHF to an ALF by [Celtic] and its chosen appraiser was [d]efendants' fault," and "failed to address the SBA [SOPs], which provided that an RHCF was not eligible for an SBA 7(a) loan."

Further, defendants aver the court "mistakenly held" a bank does not owe a borrower a duty to inform a borrower of the value of the property and argue a bank does owe a duty to the borrower to inform them of the value of the property when "the bank is under the contractual duty to do so, as is the case at hand," under the Kensey third exception. Defendants argue the loan commitment contract required the real property to be appraised for at least $2,500,000, and the $2,700,000 figure from the Cushman Appraisal improperly included fixtures and "business enterprise value." They claim this error caused the court to incorrectly conclude the real property value "was within [c]ommitment [c]ontract parameters, and therefore [Celtic] had no duty to inform [d]efendants of the appraisal, and there was no resulting breach of contract." Thus, defendants argue it is "self-evident on the fact of that document that there was a breach" and his "finding of fact, that the appraised value of the real property was

A-3686-23

within the limit of the [c]ommitment [c]ontract, was not supported by credible evidence of the appraisal report in the record and should not be corrected."

With respect to the fraud and misrepresentation claims, defendants argue the court addressed the wrong behavior in evaluating whether the second Kensey exception applied. They maintain "[t]he shocking and extreme behavior was [Celtic's] approval of a per se illegal loan and failure to disclose the failed appraisal, despite its contractual obligations," not the "downward valuation adjustment discerned from [Celtic's] internal commercial checklist." They further contend Celtic allowed them to "execute loan documents under false pretenses, through the willful concealment of information, and in doing so, took advantage of [d]efendants' lack of knowledge." Additionally, defendants claim the court "failed to account for the allegation that the intentional mislabeling of the RHCF as an ALF vastly inflated the perceived value of the Merriam Property."

Second, defendants aver the court erred in dismissing the tortious interference claims because "[a]llegations of [Celtic's] wrongdoing should have been enough to keep the claims in the pleading stage." Specifically, Celtic's wrongdoing, according to defendants, included incorrectly labelling the Merriam Business as an ALF, not an RHCF, and having the Cushman Appraisal

use ALFs as comparable properties to inflate the appraisal price. Thus, according to defendants, "[b]ut for [Celtic's] illegal and fraudulent lending practices, th[e] transaction would have never closed, and [d]efendants would not be before this [c]ourt, having been severely damaged by [Celtic's] fraud and contract breach."

Third, defendants contend "[t]he court erred in dismissing the aiding and abetting claim" and "falsely claimed [d]efendants '[did] not proffer evidence that would suggest that Celtic Bank was aware that the paperwork submitted by [Caliolio, David, and Messina] was unusual or aroused suspicion in any manner.'" Defendants claim they were not required to produce evidence at the pleading stage and that the "[c]ountercomplaint does provide sufficient allegations and facts of [Celtic's] knowledge of its wrongdoing." Specifically, defendants point to several documents submitted which, they claim, should have led Celtic to question items submitted by [Caliolio, David, and Messina] and, thus, "[t]here were sufficient allegations in the . . . counterclaim which should have resulted in the denial of [Celtic's m]otion to [d]ismiss."

Fourth, defendants argue the court erred in dismissing their contract claims. With respect to their breach of contract claim, defendants contend "[t]he court erroneously concluded . . . '[t]he broad conclusory allegations of Count V

28

for Breach of Contract in [d]efendants' [c]ounterclaims are not sufficient to demonstrate that there was a breach of contract" because Celtic "breached the [c]ommitment [c]ontract and did so by not informing the [d]efendants of the failed appraisal value." On defendants' "bad faith claim," they argue the "court also erroneously ordered that . . . claim be dismissed because the appraisal of the wrong type of facility, the disregard of SBA regulations, and the improper valuation in the appraisal 'are all the result of the risk assumed by [d]efendants when [d]efendants submitted misinformation to" Celtic.

Defendants also maintain the court erred in dismissing their unjust enrichment claim because it "erroneously concluded the contract was executed by [Celtic] based on misinformation reasonably relied upon by [Celtic]." "Defendants do not dispute they signed the loan agreements" but claim "they were fraudulently induced into executing" those agreements and, therefore, they are "void and unenforceable."

Fifth, defendants claim the court made a typographical error in dismissing their void ab initio count. They point to its decision which refers to count VII as the "void ab initio" count, which defendants claim is count VIII.[4]

_____

[4] Notwithstanding this error, defendants do not appeal the dismissal of count VIII, void ab initio, count IX, voidable, and count XII, negligent interference

29

Finally, defendants argue "[t]he court erred asserting that the economic loss doctrine further bars [d]efendants' tort claims." Defendants contend Celtic "fraudulently induced the [d]efendants into executing a [c]ommitment [c]ontract (by illegally affirming that the [d]efendants were eligible for the SBA 7(a) loan program . . .), and knowingly denying [d]efendants' right to terminate the purchase agreement." Additionally, defendants assert "as a defense and pled that the loan is subject to recission for illegality or void ab initio."

B.

With respect to court's denial of their motion for partial summary judgment and its grant of Celtic's application for summary judgment, defendants make the following arguments. Defendants identify the five proofs submitted with their summary judgment motion, which are, as noted: (1) the SBA SOPs, which defendants contends indicates a RHCF is ineligible for a SBA 7(a) loan; (2) the license of the facility that defendants maintain indicates they purchased a RHCF; (3) the loan commitment contract, which defendants assert proofs that Celtic "must obtain an appraisal and the real property must appraise for at least

with contractual relations but do appeal the correct count VII, violation of the CFA. We note this ostensible error in the court's opinion and agree it likely was referring to count VIII.

30                                                A-3686-23

$2.5 million"; (4) the appraisal report that valued the real property at $2.27 million; and (5) Celtic's admission which defendants claim that it admitted it "did not inform the [d]efendants of the results of the appraisal, did not provide the [d]efendants with a copy of the appraisal report[,] or advise [d]efendants that [p]laintiff could not meet the terms of the [c]ommitment [c]ontract." In the face of these proofs, defendants assert Celtic "entirely failed to raise any material issue in opposition to the motion, nor even adequately respond to the Defendants' [s]tatement of [m]aterial [f]acts."

Specifically, defendants contend the "court erred in finding again that [Celtic's] response was sufficient" with regards to: (1) the type of facility; (2) whether the loan was legal or not; and (3) whether [d]efendants knew about the appraisal shortfall. As to the type of facility, defendants contend "[o]nly the [operating] license matters, which [Celtic] and court were in possession of [which] prov[ed] beyond any reasonable doubt, that the property was an RHCF."

Next, as to the legality of the loan, defendants maintain Celtic "attempted to hedge against the fact that the loan was illegal, by claiming it does not matter if it was improper to lend to [d]efendants, because the only party damaged would be [Celtic] if the SBA withheld the guarantee." Defendants further note Celtic's position was that the SBA decides whether defendants qualified for the loan they

31

received. Defendants claim "[t]his is a preposterous position, given that [Celtic] sought the court's assistance to foreclose on a property whose owners it knew it could not legally lend to." Thus, defendants claim Celtic's position renders courts "powerless to protect its constituents from fraudulent lending practices." Because defendants' proofs "clearly stated the facility was ineligible and therefore, the loan was void ab initio," which, they claim, is the only appropriate remedy in this matter and failure to award such remedy is in error.

With respect to their motion for partial summary judgment, defendants contest Celtic's assertion they were "aware of the failed appraised value because they pledged additional collateral." According to defendants, "[t]his concocted 'dispute' contradicts [Celtic's] own [a]dmissions, which affirms that [Celtic] never provided [d]efendants with the report or disclosed the valuation shortfall." They further claim Celtic "never provide any evidence to support their claim that [d]efendants were aware of the failed appraisal, . . . because none exists."

Defendants also contend the "court erred in granting [Celtic's m]otion for [s]ummary [j]udgment, despite the defendants' [c]ounterclaim, brief, and supporting evidence which established a legitimate dispute as to the validity of the note, the amount owed, and the right to foreclose and take possession." Defendants list their competent proofs, which includes all the same evidence

they submitted to support their own motion for summary judgment. As noted, those proofs include the appraisal, the loan commitment contract, Celtic's admissions, and the SBA SOPs and federal regulations. Defendants contend their proofs they have provided have proven the "the two cornerstone issues raised: the illegality of the loan and the breach of [c]ontract."

Defendants maintain they "raised legitimate disputes sufficient to deny summary judgment and supported these disputes with ample evidence." Specifically, they argue the SOPs submitted prove an "SBA 7(a) loan was not available to purchase a RHCF," the $2,270,000 appraisal failed to meet the contractually required $2,500,000 threshold, Celtic's "[a]dmissions . . . affirmed that neither the appraisal report nor the results of this valuation were ever disclosed to the [d]efendants" and a "review of the documentary evidence is dispositive . . . that the loan was illegal and [Celtic] . . . covered it up by mislabeling the facility."

In their first subpoint on this argument, defendants argue "[t]he court erred again in not finding a genuine issue of material fact in dispute relating to the eligibility of the loan, despite [d]efendants' evidence to the court that the loan was ineligible." In support, defendants contend "[t]he court erroneously blames [d]efendants for [Celtic's] approval of the loan" but that "[t]here was no

allegation or supporting documents submitted by [Celtic] substantiating a claim that it relied upon any misinformation provided by [d]efendants." Thus, "[t]he court erred in making this unsubstantiated statement."

Instead, defendants maintain Celtic's "bad acts deceive[d] the [d]efendants into believing they were qualified and approved for the 7(a) loan by the SBA, even though they could not legitimately have been approved." They further argue "[o]ur [c]ourts make clear that fraudulent inducement into a loan by misrepresentations makes the loan and all documents void ab initio."

In their second subpoint, defendants claim "[t]he court erred again in not finding an issue of material fact relating to the [b]reach of [c]ontract." First, defendants argue they specified which contract Celtic breached in their summary judgment brief when it said in a point heading "Celtic Bank breached the commitment letter contract and withheld material information from defendants." Second, defendants claim they clearly showed how Celtic breached the commitment contract, by not disclosing the failed appraisal.

In their third subpoint on this argument, defendants argue "[t]he court erred by finding [d]efendants had not produced evidence to demonstrate that a genuine issue of material fact exists regarding misrepresentations by" Celtic. In support, defendants first claim they "proved material misrepresentations were

made by [Celtic], including the loan was illegal and the appraisal failed to satisfy the contract contingency, as required in the Commitment Contract." Next, defendants maintain Celtic took advantage of them "knowing they were entering into a transaction under mistake, because [Celtic] engineered the swindling, by withholding the failed appraisal information." They further claim the court erred in concluding the loan documents were valid because they were executed because "execution does not establish the documents were valid." Finally, defendants aver the "court erred by stating [Celtic] demonstrated its right to foreclose" because Celtic "has no right to foreclose and obtain possession of the property, because the note and mortgage do not exist in the eyes of the law."

## C.

Finally, defendants argue the court improperly granted final judgment because the judgment was based on its prior erroneous decisions. Thus, defendants "renew [their] assertion that the granting of the [f]inal [j]udgment of [f]oreclosure is an error because the loan documents are void" and "if [Celtic] is allowed to proceed with the foreclosure, this act would capstone the commission of a great injustice."

## III.

We begin with a discussion of the relevant standards of review. "We review a grant of a motion to dismiss a complaint for failure to state a cause of action de novo, applying the same standard under Rule 4:6-2(e) that governed the motion court." Wreden v. Twp. of Lafayette, 436 N.J. Super. 117, 124 (App. Div. 2014). In our review, we afford no deference to a trial court's Rule 4:6-2(e) motion decision. See Rezem Fam. Assocs., LP v. Borough of Millstone, 423 N.J. Super. 103, 114 (App. Div. 2011).

Under the rule, a complaint can be dismissed if the facts alleged in the complaint do not state a viable claim as a matter of law. Id. at 113-14. The standard for determining the adequacy of plaintiff's pleadings is, after a "generous" review of its contents, "whether a cause of action is 'suggested' by the facts." Green v. Morgan Props., 215 N.J. 431, 451-52 (2013) (quoting Printing Mart-Morristown, 116 N.J. at 746). "In evaluating motions to dismiss, courts consider 'allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.'" Banco Popular N. Am. v. Gandi, 184 N.J. 161, 183 (2005) (quoting Hing Q. Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004)). Consideration of documents specifically referenced in the complaint will not convert the motion into a

motion for summary judgment.  E. Dickerson & Son v. Ernst & Young, LLP, 361 N.J. Super. 362, 365 n.1 (App. Div. 2003), aff'd 179 N.J. 500 (2004).

Where the parties submit material outside the pleadings that are considered by the court, the motion effectively becomes a motion for summary judgment.  See R. 4:6-2; R. 4:46.  The standard for summary judgment is whether the moving parties have established that there are no genuine disputes as to any material facts, and, if so, whether the facts, viewed in the light most favorable to the non-moving party, entitles the moving parties to judgment as a matter of law.  R. 4:46-2(c); Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Where such additional materials are not resubmitted and relied upon, a court assess only the legal sufficiency of the claim.  Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div. 2005).  Consequently, "[a]t this preliminary stage of the litigation [courts are] not concerned with the ability of plaintiffs to prove the allegation contained in the complaint."  Printing Mart, 116 N.J. at 746.  Rather, they should accept the factual allegations as true, Sickles, 379 N.J. Super. at 106, and "search[ ] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from

an obscure statement of claim . . . ." Printing Mart, 116 N.J. at 746 (citation omitted).

"However, we have also cautioned that legal sufficiency requires allegation of all the facts that the cause of action requires." Cornett v. Johnson & Johnson, 414 N.J. Super. 365, 385 (App. Div. 2010), aff'd as modified, 211 N.J. 362 (2012), abrogated on other grounds by McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 592 (2017). In the absence of such allegations, the claim must be dismissed. Ibid. (citing Sickles, 379 N.J. Super. at 106).

Generally, when courts dismiss for failure to state a claim, they dismiss without prejudice. Smith v. SBC Commc'ns Inc., 178 N.J. 265, 282 (2004). But a court may dismiss with prejudice under some circumstances, including when "plaintiffs have not offered either a certification or a proposed amended pleading that would suggest their ability to cure the defects" in their complaint, Johnson v. Glassman, 401 N.J. Super. 222, 246 (App. Div. 2008), or the opportunity to cure "would be a 'futile' and 'useless endeavor,'" Cona v. Twp. of Washington, 456 N.J. Super. 197, 214 (App. Div. 2018).

We similarly review the disposition of a summary judgment motion de novo, applying the same standard used by the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015) (citing Brill, 142 N.J. at 540). Like the trial court, we

view whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill, 142 N.J. at 540). If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" courts will "not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

If there are materially disputed facts, the motion for summary judgment should be denied. Pantano v. N.Y. Shipping Ass'n, 254 N.J. 101, 115 (2023). "'A material fact is one which is really in issue in the case.'" State v. Buckley, 216 N.J. 249, 261 (2013) (quoting State v. Hutchins, 241 N.J. Super. 353, 359 (App. Div. 1990)). Courts must consider if the disputed fact is genuine or of "an insubstantial nature." Brill, 142 N.J. at 529. As such, a non-moving party will not be successful in defeating a motion for summary judgment "merely by pointing to any underlying fact in dispute." Ibid.

The opposing party must produce evidence that creates a genuine issue of material fact, and "[c]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Vizzoni v. B.M.D., 459 N.J. Super. 554, 567 (App. Div. 2019) (quoting Puder v. Buechel, 183 N.J. 428, 440-41

(2005)). A motion for summary judgment will not be defeated by bare conclusions lacking factual support, Petersen v. Twp. of Raritan, 418 N.J. Super. 125, 132 (App. Div. 2011), self-serving statements, Heyert v. Taddese, 431 N.J. Super. 388, 414 (App. Div. 2013), or disputed facts "of an insubstantial nature," Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:46-2 (2026). "[S]elf-serving assertions, unsupported by documentary proof in their dominion and control, '[are] insufficient to create a genuine issue of material fact.'" Miller v. Bank of America Home Loan Servicing, L.P., 439 N.J. Super. 540, 551 (App. Div. 2015) (quoting Heyert, 431 N.J. Super. at 414).

Finally, we review a decision granting a motion for entry of a final judgment of foreclosure for abuse of discretion. Customer's Bank v. Reitnour Inv. Props., LP, 453 N.J. Super. 338, 348 (App. Div. 2018). "'Although the ordinary "abuse of discretion" standard defies precise definition, it arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Ibid. (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

## IV.

## A.

Next, we discuss the substantive legal principles with respect to defendants' counterclaims, beginning with defendants' claims related to fraud and misrepresentation. We note when a party alleges fraud, a heightened standard applies to the pleading under Rule 4:5-8(a), which requires that "all allegations of misrepresentation, fraud, mistake, breach of trust, willful default or undue influence, particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable." It also provides "[m]alice, intent, knowledge, and other condition of mind of a person may be alleged generally." R. 4:5-8(a). Accordingly, "Rule 4:5-8(a) requires that fraud be pled in the particulars." Piscitelli v. Classic Residence by Hyatt, 408 N.J. Super. 83, 116 (App. Div. 2009).

If pled with such specificity, establishing a claim for fraudulent misrepresentation or fraudulent inducement requires that a party show the existence of "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief . . . of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Kaufman v. I-Stat Corp., 165 NJ. 94, 109 (2000); Nolan v. Lee Ho,

41

120 N.J. 465, 472 (1990). Similarly, "negligent misrepresentation constitutes '[a]n incorrect statement, negligently made and justifiably relied on, [and] may be the basis for recovery of damages for economic loss . . . sustained as a consequence of that reliance,'" if pled with specificity. McClellan v. Feit, 376 N J. Super. 305, 317 (App. Div. 2005).

Additionally, "[t]o prevail on a CFA claim, a [party] must establish three elements: '1) unlawful conduct by [one party]; 2) an ascertainable loss by [the other party]; and 3) a causal relationship between the unlawful conduct and the ascertainable loss.'" Zaman v. Felton, 219 N.J. 199, 222 (2014) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009)). Finally, equitable fraud requires "(1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party." McClellan, 376 N.J. Super. at 317 (quotation marks omitted) (citing First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 136-37 (2003)). Knowledge of the falsity, however, is not necessary to show equitable fraud. Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 625 (1981).

As noted, New Jersey courts have concluded that "[s]ilence in the face of a duty to disclose" constitutes fraud in the following circumstances: (1) "fiduciary relationships such as principal and agent or attorney and client"; (2)

A-3686-23

where either party, by entering the transaction, "'expressly reposes . . . a trust or confidence in the other . . . or [because of the] circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence . . . is necessarily implied'"; and (3) "contracts or transactions which in their essential nature, are 'intrinsically fiduciary,' and . . . 'necessarily call[ ] for perfect good faith and full disclosure.'" Kensey, 306 N.J. Super. at 551 (quoting Berman v. Gurwicz, 189 N.J. Super. 89, 93-94 (Ch. Div. 1981)).

B.

In order to state a claim of tortious interference with contractual relations, a party must plead facts sufficient to establish: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003). The fact that a party acted to advance its own interest and financial position does not establish the necessary malice or wrongful conduct. Dello Russo, 358 N.J. Super. at 268. A claim for tortious interference with the performance of a contract must be based on "facts claiming that the interference was done intentionally and with malice." Id. at 269 (citing Printing Mart-Morristown, 116 N.J. at 751). Further, "[a] bank is entitled to

43

accept what appears to be a perfectly routine and unexceptionable transaction at face value without intruding itself into the parental or the legal relationships involved." Fam. First Fed. Sav. Bank v. DeVincentis, 284 N.J. Super. 503, 509 (App. Div. 1995).

C.

Liability for aiding and abetting "is found in cases where one party 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" State ex rel. McCormac v. Qwest Commc'ns Int'l, Inc., 387 N.J. Super. 469, 481 (App. Div. 2006) (quoting Judson v. Peoples Bank & Tr. Co., 25 N.J. 17, 29 (1957)). "[T]he mere common plan, design or even express agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution." Id. at 483 (citing Restatement (Second) of Torts § 876(b) cmt. d (Am. Law Inst. 1979)). Additionally, there must be proof of the underlying tort committed by the principal. Id. at 484.

A plaintiff proves a claim for aiding and abetting by showing the following:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides

44

the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

[Id. at 483-84 (quoting Tarr v. Ciasulli, 181 N.J. 70, 84 (2004)).]

Aiding and abetting liability focuses on "whether a defendant knowingly gave substantial assistance to someone engaged in wrongful conduct, not whether the defendant agreed to join the wrongful conduct." Podias v. Mairs, 394 N.J. Super. 338, 353 (App. Div. 2007) (alteration in original) (citations, internal quotations, and emphasis omitted). Determining how much assistance is considered substantial is fact-sensitive. Ibid.

D.

To establish a breach of contract claim, the party asserting the claim is required to prove: "the parties entered into a contract containing certain terms;" one party "did what the contract required [it] to do"; the other party "did not do what the contract required [it] to do"; and the " breach, or failure to do what the contract required, caused a loss." Goldfarb v. Solimine, 245 N.J. 326, 338-39 (2021) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)).

Further, a claim for breach of the implied covenant of good faith and fair dealing requires proof a contract existed between the parties and one party acted with bad faith and deprived the other of rights or benefits under the contract.

45

See Wade v. Kessler Inst., 343 N.J. Super. 338, 346-52 (App. Div. 2001) (explaining the different ways courts have defined the covenant). Stated differently, it must be proven one party "destroyed [the other's] reasonable expectations and right to receive the fruits of the contract[.]" Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 425 (1997). "Proof of 'bad motive or intention' is vital." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 241 (2001)); Wade, 343 N.J. Super. at 346 (highlighting the importance of bad faith to this cause of action).

E.

"The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Goldsmith v. Camden Cty. Surrogate's Office, 408 N.J. Super. 376, 382 (App. Div. 2009) (internal quotation marks omitted). "To establish a claim for unjust enrichment, 'a [party] must show both that [the opposing party] received a benefit and that retention of that benefit without payment would be unjust.'" Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007) (quoting VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)). Further, we recognized that a plaintiff could plead alternative theories of recovery, one based upon a valid

46

contract, another based upon quasi-contract "that does not depend on there being an express contract." Caputo v. Nice-Pak Prods., Inc., 300 N.J. Super. 498, 505 (App. Div. 1997).

F.

Finally, the economic loss doctrine prohibits the "recover[y] in tort economic losses to which their entitlement only flows from a contract." Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Co., 66 F.3d 604, 619 (3d Cir. 1995)). Our Supreme Court adopted this doctrine in Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 579-81 (1985) (finding that "tort principles, such as negligence, are better suited for resolving claims involving unanticipated physical injury, particularly those arising out of an accident[,]" and "[c]ontract principles . . . are generally more appropriate for determining claims for consequential damage that the parties have, or could have, addressed in their agreement[,]" ultimately concluding that "economic expectations . . . protected by the [Uniform Commercial Code] are not entitled to supplemental protection by negligence principles.").

Generally, "[t]he pattern that has emerged in New Jersey decisional law is that claims for fraud in the performance of a contract, as opposed to fraud in the

47

inducement of a contract, are not cognizable under New Jersey law." Bracco

Diagnostics, Inc., 226 F. Supp. 2d at 564. "Courts have continued to affirm 'the

conceptual distinction between a misrepresentation of statement of intent at the

time of contracting, which then induces detrimental reliance on the part of the

promisee, and the subsequent failure of the promisor to do what he has

promised.'" Id. at 564 (quoting LoBosco v. Kure Eng'g Ltd., 891 F. Supp. 1020,

1032 (D.N.J. 1995)). In this regard, only those pre-contractual

misrepresentations that are extraneous to the parties' contract may be brought

alongside a breach of contract claim. Ibid.

## V.

Against these principles, we affirm the court's decision to grant Celtic's

motion to dismiss, in part, for the reasons expressed by the court in its June 20,

2023 decision but add the following comments. While we agree the court, at

times, seemed to suggest evidence was required to support defendants' pleading,

we note the court issued a single opinion addressing both the motion to dismiss

and defendants' application for partial summary judgment and, when viewed in

that context, are satisfied the court properly applied Rule 4:6-2(e). What is

further significant to note is that the court had before it not just a typical Rule

4:6-2(e) application, but also defendants' partial motion for summary judgment

A-3686-23

supported by documentary evidence, and an extensive litigation history between the parties with which the court was extremely familiar and which clearly informed its consideration regarding the lack of merit of defendants' counterclaims in the context of the foreclosure complaint. In any event, against our de novo review, we are satisfied the court correctly dismissed defendants' counterclaims.

First, we conclude defendants' fraud and misrepresentation counterclaims, including allegations of negligent misrepresentation, equitable fraud, fraudulent misrepresentation, violation of the CFA, and fraudulent inducement, fail to state a claim, because, as concluded by the court and argued by Celtic, defendants' complaint fails to meet the heightened pleading standard required for causes of action for fraud or misrepresentation. As noted, defendants' claims all require, to some degree, a misrepresentation by Celtic to defendants upon which they detrimentally relied. We find, on its face, the complaint failed to sufficiently allege Celtic made any misrepresentations to defendants nor have defendants adequately pled any reliance on such a misrepresentation. Instead, the allegations, when viewed in context, are insufficiently pled, as they are conclusory and are based on vague and summarily-asserted conspiracy claims.

A-3686-23

Further, other than asserting Celtic knowingly mislabeled the Merriam Property as an ALF, defendants have not pled Celtic made a misrepresentation of fact to them, even when viewed in the indulgent standard set forth in Rule 4:6-2(e). We reject defendants' argument that the alleged mischaracterization of the Merriam Property was a misrepresentation accountable to Celtic and subject to redress by defendants, in light of defendants' extensive and repeated emphasis in the complaint of the roles that their agents Caliolio, David, and Messina served in forwarding false statements to procure the loan.

We further find defendants failed to allege sufficiently any reliance on purported misrepresentations and reject defendants' assertion that the SBA SOPs establish Celtic could not offer them a loan. Defendants' pleadings are, again, conclusory and fail to identify where the SOPs expressly prohibit the loan defendants received. We also note, as Celtic argues, defendants' alleged ineligibility for an SBA loan seemingly only adversely affects Celtic as it would potentially lose its partial guarantees from the SBA. To the extent defendants' interests would be affected by the loan's SBA eligibility, we find defendants have not alleged any change in its status with the SBA.

We also reject defendants' contentions that the Kensey second exception applies. Our review of the contract confirms it expressly gives Celtic the

authority to undertake the action that defendants allege, such as relying on documentation submitted by defendants' agents or adjusting the third-party appraisal for internal purposes.  The contract consistently affirms Celtic's "sole discretion" to verify and approve all relevant documentation to its own "satisfaction."   We are convinced no language in the loan commitment agreement is "so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling."  Kensey, 306 N.J. Super. at 554.

We further reject defendants' contentions that the Kensey third exception should apply and conclude there is "no presumed fiduciary relationship between a bank and its customer."  Ibid.  We reject defendants' argument that the loan commitment agreement establishes a fiduciary duty because it requires Celtic to obtain an appraisal valuing the Merriam property at no less than $2,500,000.  We note, and neither party disputes, that Cushman appraised the Merriam Property at $2,700,000, which is within the terms of the loan commitment.  Defendants concede that the valuation was not decreased until Celtic Bank reviewed the appraisal and decreased the valuation to $2,370,000.  To the extent this provision of the contract establishes any obligations from Celtic, we are convinced the Cushman Appraisal clearly satisfies the loan commitment agreement.

Second, we agree with the court that defendants failed to sufficiently plead their tortious interference with contractual relations and aiding and abetting claims. As noted, defendants' allegations with respect to both of these claims centered on Celtic's purported intentional mischaracterization of the Merriam property, which defendants themselves conceded was provided by their third-party agents. The complaint failed to sufficiently allege in a non-conclusory fashion that Celtic was aware of any purported misrepresentations in the documents presented to it, knew of the alleged fraud perpetrated by Caliolio, David, and Messina, and knowingly participated in such fraud.

Third, we conclude the complaint failed to sufficiently state a claim for the contract-based claims because, as the court concluded, it fails to identify which contracts Celtic allegedly breached, how such contracts were breached, and damages those breaches caused. To the extent defendants rely on a breach of the loan commitment agreement, we agree with the court that defendants failed to properly allege such a breach based on Celtic's internal reduction of the value of the Cushman appraisal. Rather, we find the loan commitment agreement required Celtic to obtain a $2,500,000 appraisal of the Merriam property, which neither party disputes, was satisfied. Further, defendants failed to plead how the later internal reduction supported a breach of contract claim,

in light of the discretion that the loan commitment agreement afforded Celtic with respect to the loan defendants received.

Further, we also reject defendants' argument that the loan commitment agreement requires Merriam property to be eligible for an SBA loan. We conclude the loan commitment agreement, by its own language, specifies defendants were "conditionally approved for an SBA loan" and mandates they provide such documentation "as are required by the SBA" to the "sole discretion" of Celtic. We find the terms of the contract empowered Celtic to make determinations with regards to the SBA loan.

With respect to the implied duty of good faith and fair dealing, defendants again alleged Celtic intentionally violated SBA policies and improperly appraised the Merriam Property and Merriam Business. We conclude the complaint, however, failed to sufficiently allege how any of Celtic's purported actions denied defendants the benefit of the bargain, and, in fact, the complaint clearly established Celtic provided defendants with the loan for which they applied.

Fifth, we conclude the complaint fails to allege Celtic retained any benefit to which it was otherwise unentitled and, therefore, failed to state a claim for unjust enrichment. Defendants merely state in summary fashion that "[d]uring

53

the period from approximately June 30, 2018 through the present, Celtic . . . unjustly enriched itself by wrongfully converting, taking, utilizing or managing the property and financial interests of" defendants.

Finally, in any event, as the court noted, we are satisfied the economic loss doctrine bars defendants' tort claims in counts one, two, three, four, seven, eleven, and twelve because defendants have not sufficiently alleged how a separate duty has arisen from the allegedly tortious acts and the contractual obligations. We conclude the complaint states direct contract breaches that stem from the loan commitment agreement and does not sufficiently allege any pre-contractual misrepresentations. We reject defendants' attempts to repurpose and recharacterize their arguments into a tort theory of recovery as unpersuasive.

VI.

Finally, we discuss the court's decision to deny defendants' motion for partial summary judgment and its decision to grant Celtic's motion for summary judgment and final judgment for foreclosure. We begin with the relevant substantive legal principles. "The only material issues in a foreclosure proceeding are the validity of the mortgage, the amount of the indebtedness, and the right of the mortgagee to resort to the mortgage premises." Great Falls Bank v. Pardo, 263 N.J. Super. 388, 394 (Ch. Div. 1993), aff'd, 273 N.J. Super. 542

(App. Div. 1994). Thus, a party need only present three elements to establish a prima facie right to foreclose: "the execution, recording, and non-payment of the mortgage." Thorpe v. Floremoore Corp., 20 N.J. Super. 34, 37 (App. Div. 1952). Non-germane claims against the plaintiff should not be considered in a foreclosure action. R. 4:64-5. A germane defense is one that affects the validity or invalidity of the mortgage itself. See DeVincentis, 284 N.J. Super. at 512 (App. Div. 1995).

In DeVincentis, the defendant mortgaged a lot she owned as security for a loan to provide money for a business venture for her son. DeVincentis, 284 N.J. Super. at 506. The loan went into default, and the bank brought a foreclosure action. Ibid. The defendant filed an answer raising a number of affirmative defenses, arguing the mortgage was unenforceable and invalid. Ibid. The trial judge held none of the asserted defenses were sufficient to defeat foreclosure and granted summary judgment to the plaintiff. Ibid. On appeal, the court concluded that whatever claims the defendant might have against her son or his business partners did not affect the validity of the mortgage, affirming summary judgment for the bank. Id. at 508-09.

We first find the court correctly denied defendants' motion for partial summary judgment with respect to its counterclaims for negligent

misrepresentation, equitable fraud, breach of contract, breach of good faith and fair dealing, violation of the CFA, and fraudulent inducement, as the sparce motion record failed to establish defendants' right to such a remedy. As noted, defendants submitted their application in response to Celtic's motion to dismiss and supported their application with only a certification from their counsel which appended several exhibits, including the SBA SOPs, the license of the facility, the loan commitment agreement, Celtic's internal appraisal report, and Celtic's admissions in response to defendants' request.

We are convinced these proofs were wholly insufficient to support defendants' motion and reject defendants' argument that the court failed to properly consider them. Stated differently, defendants failed to offer sufficient competent proofs to support their claims, including, any Rule 1:6-6 affidavits of witnesses with personal knowledge of the loan with Celtic or even general knowledge of the process to procure an SBA loan.

Instead, defendants placed disproportionate emphasis on the SBA SOPs, which, based on the citations relied upon by defendants' in the motion, do not appear to support the dispositive legal conclusion that its property is "per se" ineligible for an SBA loan. Rather, the guidelines cited by defendants merely establish ALFs may be eligible and do not offer further guidance specifically

with respect to the eligibility of a RHCF, nor have they cited any other legal authority or competent proofs to the contrary.

We also reject defendants' arguments that Celtic, relying on financial and tax documentation prepared by defendants' agents constituted fraud, that the Cushman Appraisal did not satisfy the loan commitment agreement's provision for an appraisal, and that Celtic knowingly and illegally violated SBA policies and procedures. Defendants merely reiterate many of the same arguments they have raised repeatedly asserted in this litigation concerning Celtics purported knowledge of false information and impropriety in the appraisal process. Accordingly, we are satisfied the court properly rejected defendants' motion for summary judgment based on the sparse record defendants presented to the court.

Conversely, with respect to its own motion for summary judgment, we find Celtic unquestionably established a prima facie right to foreclose on the Merriam Property and Merriam Business. The record is replete with references to execution of the note, mortgage, and personal guarantees, all of which are executed and signed by defendants to secure funding from Celtic and to which there is no dispute. The record also contains evidence Celtic duly recorded the mortgage in Sussex County.

A-3686-23

Finally, the record contains competent proofs to show defendants defaulted on their loan obligations and Celtic accordingly served them with a notice of default and a demand for balance on June 22, 2021. This notice indicated defendants were more than ten days delinquent three of the four months preceding the notice and were fifty-three "days past due for their April and May obligations." Therefore, the court properly granted summary judgment for Celtic.

To the extent we have not addressed any of the parties' remaining arguments with respect to the motion to dismiss, summary judgment, or final judgment of foreclosure, it is because we have determined they lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3686-23